[No. 8981.    Department Two.    January 7, 1911.]

CHARLES H. BAKER, *Appellant*, v. SEATTLE-TACOMA POWER
COMPANY *et al.*, *Respondents*.[1]

CORPORATIONS —STOCKHOLDERS— DEALINGS WITH CORPORATION —
PROFITS MADE. Where the continued existence of a corporation re-
quires the purchase of a competing business, a syndicate consisting
of officers and a majority of the stockholders of the corporation may,
after full disclosure of all the facts, acquire the property and resell
it to the corporation at a profit to themselves, and are not within the
rule preventing officers of a corporation from dealing in property of
the corporation (CHADWICK, J., dissenting).

SAME—ACTION BY STOCKHOLDER—WAIVER OF OBJECTIONS—ESTOP-
PEL. A minority stockholder is estopped from maintaining a suit
to compel a syndicate, consisting of officers and a majority of the
stockholders, to pay to the corporation a profit realized by them in
the purchase of a competing business, to save the life of the cor-
poration, and a resale by them to the corporation at a profit, where
such minority holder, after objecting to the sale, made a written
waiver of his objections and ratified the sale, in order that certain
bonds of the corporation could be sold (CHADWICK, J., dissenting).

SAME—MEETINGS—VOTING BY PROXY. A stockholder's proxy
clothes the proxy holder with full power to represent such portions
of the stock, and binds the absent owner, in the absence of fraud.

[1]Reported in 112 Pac. 647.

CORPORATIONS—STOCKHOLDERS—ACTIONS BETWEEN—ALLOWANCE OF ATTORNEY'S FEES. Where, in an action by a stockholder to recover from officers and other stockholders a profit realized by them in dealings between themselves and the corporation, payments are made to the corporation by stockholders who do not care to contest the matter, it is proper to allow the plaintiff an attorney's fee, although the payments were voluntary.

Cross-appeals from a judgment of the superior court for King county, Gilliam, J., entered February 9, 1910, upon findings in favor of the defendant, after a trial on the merits before the court without a jury, in an action by stockholders to vacate a sale of property to a corporation and for other equitable relief. Affirmed.

*Roberts, Battle, Hulbert & Tennant, C. J. France,* and *E. N. Zoline,* for appellant.

*Peters & Powell,* for respondents.

MORRIS, J.—In May, 1907, appellant commenced this action on behalf of himself and other stockholders of the respondent company. The theory of the action is, that in April, 1905, N. H. Latimer and some fifteen associates organized a syndicate, to acquire the stock and properties of two corporations named the Mutual Light & Heat Company and the Diamond Ice & Storage Company; that at the time of this transaction, Mr. Latimer and all his associates save one were connected with the respondent company as stockholders and in various official capacities, owning and controlling the majority stock of the company; that this syndicate fraudulently combined and conspired to obtain control of the stock and property of the Mutual Light & Heat Company and the Diamond Ice & Storage Company, and to transfer the same to the respondent company, to its great loss and detriment and to the great financial profit of the syndicate, the fraudulent purpose and intent being consummated by the transfer of these properties to the respondent company in June, 1905, some fifty-nine days after the purchase, at an estimated profit of $50,000, which was divided among the

syndicate pro rata with the amount contributed. The relief asked for originally was the setting aside of the transfer to the respondent company, and for the restitution of the purchase price, or for a recovery of the profits made by the syndicate, or those of its members who stood in a fiduciary relation to the company.

The answer admits the organization of the syndicate and the purchase of the properties of the Mutual Light & Heat Company and the Diamond Ice & Storage Company, and the subsequent transfer and sale to the respondent company; denies any fraud or conspiracy to defraud; and affirmatively alleges that the transactions complained of were authorized at a regular meeting of the stockholders of the respondent company; that the appellant was present and voting at such meeting, and was opposed to the action of the majority; that at the time of such authorization, the respondent company had under consideration the execution and delivery to the Northern Trust Company of Chicago of a mortgage or trust deed, to secure an issue of $7,500,000 of its bonds; that it was the intention to then issue $1,150,000 of such bonds and sell the same to N. W. Harris & Company, for the purpose of supplying the company with funds for its corporate uses, among which was the purchase of the stock and properties of the two corporations referred to; that the company was not willing to execute said mortgage, nor to issue said bonds, nor were the owners of the transferred properties willing to transfer the same to the company unless appellant would waive and withdraw his objection; that thereupon appellant did waive all objections to the transaction, and did signify his acquiescence in the same by executing, after a complete investigation and with full knowledge, the following waiver:

"Seattle, Wash., July 17, 1905.
"Messrs N. W. Harris & Co., and N. H. Latimer and his associates in what is known as the Diamond Ice & Storage Co., Syndicate:
"Gentlemen: While the purchase by the Seattle-Tacoma Power Company of the properties of the Mutual Light &

Heat Company and the nineteen hundred ninety-four (1994)
shares of the capital stock of the Diamond Ice & Storage Co.,
as authorized and directed at the meetings of the stockholders
of the Seattle-Tacoma Power Company and of the board of
trustees of that corporation, held on June 15, 1905, and June
19, 1905, did not meet with my approval as a matter of busi-
ness expediency, yet after a further and full investigation of
all the facts, and in view of the figures submitted and ex-
plained to me by Mr. Latimer, and in order that the pro-
posed purchase of certain first mortgage bonds of the said
Seattle-Tacoma Power Company may be completed by
Messrs Harris & Co., and in order that the sale and transfer
of the properties of the Mutual Light & Heat Company and
the said shares of stock of the said Diamond Ice & Storage
Co. may be finally effected and completed free from any ob-
jection upon my part, and in order that the said properties
and stock may be brought under the lien of the mortgage
securing the said bonds, I do hereby ratify and confirm each
and all of the proceedings taken and done at any and all of
the said meetings of said board of trustees and of the stock-
holders of said Seattle-Tacoma Power Company in accord-
ance with and as shown by the copies of the minutes hereto
attached.

"Executed in presence of            Chas. H. Baker.
    "Thomas B. Hardin."

The answer further set forth that, relying upon this
waiver of all objections, the aforesaid mortgage was executed
in August, 1905, covering the property acquired from the
syndicate, and $1,982,000 of bonds issued and sold there-
under. It is further alleged that, in June, 1906, the power
company executed an additional or supplemental mortgage
to the same trust company, to secure these bonds, and that
the property acquired by the power company from the syndi-
cate was purchased in good faith; that is, was fully worth
the amount paid, and that no objections were ever made after
the purchase until appellant commenced his action, some two
years after the transaction complained of. Appellant sought
to overcome the effect of this waiver of his objections by
pleading in his complaint, in evident anticipation of its value

to respondent as a defense, that it was signed under duress, and that he did not withdraw or surrender his opposition to the alleged wrongful acts of respondent in bringing about the sale and transfer to the power company; and evidently anticipating a charge of laches, he pleaded further that he delayed in bringing suit, hoping some favorable contingency would arise in which the matter might be satisfactorily adjusted. Upon the trial, appellant waived any claim to rescind the sale, and confined his efforts to an attempt to obtain a restitution to the power company of the profits of the sale. Those profits he alleged were about $50,000, while respondent admits the profits to be $24,278.87.

The facts upon which there seem to be now no contention are these: . The Seattle-Tacoma Power Company was, in 1905, engaged in supplying electricity to the cities of Seattle and Tacoma, and had been seeking to establish itself in Seattle as a retailer of such power. In this effort it found itself confronted with serious opposition, especially in the business section of the city where the most profitable business was to be found. This opposition was furnished by the Seattle Electric Company, and the Mutual Light & Power Company, each of which was owning and operating a steam-heating plant in connection with its electric lighting business. The Seattle Electric Company's heating franchise covered that portion of Seattle's business district south of Madison street, and the Mutual Light & Power Company and the Diamond Ice & Storage Company's franchise covered that portion north of Madison street. The Mutual Light & Power Company and the Diamond Ice & Storage Company were closely allied corporations, being controlled by a Mr. Crane, and were virtually operated as one company. The situation was therefore this: The Seattle-Tacoma Power Company could sell only light and power; the rival companies could sell heat, light, and power, and in order to obtain the business, could, and did, make rates for light and power at comparatively low rates, while exacting a high rate

for heat, which could be done because of no competition in the territory covered by the respective franchises. These low rates for light and power the power company could not meet and do business on a profitable basis. It therefore found itself in a precarious financial condition. It could not get business, it could not pay dividends, it could not even pay its taxes. At this juncture of affairs it became known that the Mutual Light & Power Company and the Diamond Ice & Storage Company—the Crane properties—were for sale, and it was at once evident that should these properties fall into the hands of the Seattle Electric Company, the power company would virtually have to go out of business so far as the big business of the city was concerned. It was therefore not only desirable, but almost necessary, that the Crane companies should be controlled by the power company.

This situation was called to the attention of the trustees by the manager of the company, in a letter in which he showed how the power company was losing some $60,000 a year by virtue of the situation, and how imperative it was that the Crane properties be acquired and the power company thus put in a situation where it could obtain business in the down-town section of the city. The power company, however, had no money to make this purchase, and it was then that Mr. Latimer, the president of the company, after consultation with its other officials and local stockholders, organized this syndicate and eventually purchased the Crane properties, in order that such properties might be in friendly hands until such time as the power company was in a position to take them over. The purchase by the syndicate was in April, 1905, and on June 19, 1905, at a called meeting of the stockholders, after hearing the report of a committee previously appointed to investigate the Crane properties and report on their value, the purchase by the power company was authorized by the stockholders.

It is apparent from what happened at this meeting that there was a full and complete disclosure of all the facts in

relation to the matter; it was very fully discussed by a num-
ber of those present, and all seemed to have a full knowledge
and understanding of the situation at the time the purchase
was authorized.   In addition to the other facts upon which
the stockholders acted at this meeting of June 19, were three
reports, made in full detail by certified public accountants,
showing the exact situation of the Crane properties at the
time of the taking of the option to purchase by the syndicate,
some time prior to April, the situation in April at the time
of the purchase by the syndicate, and the situation on June
19, the day of the purchase by the power company.   These
reports covered the condition of the Crane properties for the
years 1902-3-4-5.   The evidence shows, in addition to mak-
ing known the price at which the syndicate purchased—
$320,000—and the price asked of the power company—
$349,600—a full statement was made of moneys expended
by the syndicate in its control of the property, and the
profits of the business during the period of its ownership.
In fact, it is difficult after reading the record to imagine
what additional knowledge could have been communicated
to the stockholders in order for them to obtain a full and
complete understanding of the situation.   That they did
so is evidenced best by their act.   Appellant admits the wisdom
of their act, by saying in his brief, "the evidence is conclusive
in this case upon the point that the properties of the Mutual
Light & Heat Company were properties which it was almost
necessary for the power company to acquire."   It is equally
conclusive to our mind, as found by the court below, that
at the meeting of the stockholders of the power company
on June 19, held to consider the purchase of the Crane prop-
erties from the syndicate, "said meeting was fairly held, and
that all the facts and circumstances in connection with said
sale were fully and clearly disclosed to the stockholders of
said Seattle-Tacoma Power Company; that it was fully known
and understood by said stockholders at said meeting and prior
to said sale, who were the owners of the property and from

whom the same was being purchased and the amount of profit which the sellers were making on such sale; that plaintiff, prior to the consummation of said sale, and with full knowledge of all the facts and circumstances connected with the same, acquiesced in such sale and waived all objections thereto."

The contention of appellant is that the trustees of a corporation stand in a fiduciary relation to the corporation, and are to be regarded as its agents to transact its business for the benefit of its stockholders; that so standing and so acting, all their acts must be for the benefit of the corporation, and not for their own benefit; and if by their acts they receive any profit from the corporation's business, equity will regard such profit as the property of the corporation. As an abstract statement of a legal proposition, that such is the law will readily be admitted; but like every other rule of law, it must be concreted with proper facts, before it will be announced as the law in any given case. No such facts are present in this record. There is nothing in the law to prevent trustees or other officers of a corporation, who may as individuals own certain property which it is necessary or advantageous for the corporation to acquire, from selling such property to the corporation at its fair value, and making a profit on the transaction, when such sale is made with a full disclosure on the one side and a full understanding on the other side of all the facts entering into or affecting the transaction. In so doing they are not within the rule contended for by appellant—dealing with the property of the corporation and reserving to themselves the profits. They are dealing with their own property, which, if desired by the corporation, can be sold and purchased as may any other property derived from any other source.

Appellant in his argument urges the fact that members of the syndicate represented the majority of the stockholders, either in their own holdings or by virtue of proxies from other stockholders, and says, in making disclosures and in selling,

they were disclosing to themselves what they already knew, and purchasing in one relation what they already owned in another. It does not alter the legal situation that the syndicate represented the majority of the stock either in person or by proxy. In voting their own stock, or that which they represented by proxy, they were within their legal rights. The proxy clothed them with full power to represent such portions of the stock, and binds the absent stockholder to the same extent as if so voted in person, in the absence of any fraud or exceeding of authority, as between him and his principal. *Synot v. Cumberland*, 117 Fed. 379. Accepting as a further rule contended for by appellant, that in cases of dealing between a stockholder of a corporation and the corporation itself, the burden is on the stockholder to show good faith and honesty in every feature of the transaction and to such end the transaction will be carefully scrutinized by the courts, the respondent has fully sustained such burden in this instance, and the most exacting scrutiny discloses no evidence of actual or intentional fraud, or other circumstance that should be permitted to impair the validity of the transaction.

We are further of the opinion that appellant, by reason of his written waiver the execution of which induced the purchase, the execution of the trust mortgage and the issuance of bonds, is now estopped from seeking to overthrow such purchase. Neither can we, as pleaded by him, find any duress or other intimidating reason for his execution of such waiver. At the time of the purchase on June 19, 1905, he opposed the purchase. Doubtless he had reason satisfactory to himself for such opposition. One month later he says: "After a further and full investigation of all the facts and in view of the figures submitted and explained," he withdraws his opposition and ratifies and confirms the entire transaction. He then waits two years before again expressing his attitude toward the transaction, when he returns to his first opinion and brings this action to set aside the sale and re-

store the profits. Then he waits another two years before he seeks a trial of his action. That such conduct is laches seems to us irrefutable. *Wright v. Tacoma Gas & Elec. L. Co.*, 53 Wash. 262, 101 Pac. 865.

One other feature of the record requires a ruling. The court below found that, subsequent to the commencement of the action, N. W. Harris & Company and Howard. W. Baker, although not made parties by service, yet because of the commencement of the action, paid into the power company the sum of $12,195, and being of the opinion that the corporation had profited to that extent by reason of appellant's suit, it awarded him $750, as an attorney's fee in this action. From this portion of the decree the power company brings a cross-appeal, contending that, inasmuch as the court found no equity in plaintiff's action, it was not justified in awarding him $750 as an attorney's fee for bringing an unjustified suit; and further, there is nothing to justify a holding that these payments were made because of this suit. We are referred by appellant to a number of cases holding that, where a stockholder brings an action for the benefit of the corporation, and recovers property of which it has been deprived, he is entitled to recover a reasonable attorney's fee. Two things occur in these cases which are not present here. The corporation had been wrongfully deprived of its property, and the suing stockholder had been successful in recovering it. The corporation in the case at bar has not been wrongfully deprived of its property; neither has any such property been recovered. Howard Baker paid back his share, it appears, because the amount was small, and he could not afford to bother with it, regardless of the right or wrong of the matter, and have trouble with appellant who is his brother. Harris & Company thought they had a legal right to the money, but inasmuch as they had made a profit on the bonds and were associated in various ways with the Bakers. in the affairs of the Baker estate, they preferred to return the money rather than to have any question raised by appellant. It therefore

appears that, while appellant has not been successful in his action in demonstrating that there is property belonging to the corportion that should be restored to it, he has, by reason of his position in the matter, caused the corporation to receive $12,195 it would not otherwise have received. The bringing of this action has enriched the corporation that much. It does not seem equitable to us, although conceding the case is not within the rule generally applied, to permit the corporation to retain this money and appellant bear all the burden of its acquirement. It is probably true that in most cases where counsel fees have been allowed in actions of this character, the payments have been involuntary. Here the payment was voluntary, but it was apparently induced by the commencement of the action, and we think the same rule should obtain.

The cross-appeal is therefore denied, and the judgment as appealed from is affirmed.

RUDKIN, C. J., and CROW, J., concur.

DUNBAR, J., concurs on the ground of estoppel alone.

CHADWICK, J. (dissenting)—I cannot agree with my associates in their disposition of this case. The rule being that trustees of a corporation act in a fiduciary capacity and are to be held to the strictest accountability, a wrong to the corporate body should not go uncorrected because of equities or estoppels arising between individual stockholders. If plaintiff alone were concerned—that is, if the loss or gain were chargeable to him alone, it might be properly held that he was estopped to maintain this action. We may admit that appellant has by his conduct estopped himself, but in this class of cases it is not the right of some individual with which we are concerned, but the fundamental principles of the law, and the rule declared should be applicable in all cases where those in authority use their place and power to exploit a corporate body for their individual gain. This suit is maintained for the benefit of the corporation which has suffered

a wrong which, by reason of the majority stock holdings of the manipulators of the deal, it was powerless to prevent. In Morawetz on Private Corporations, vol. 1 (2d ed.), § 262, it is said:

"The benefit of an action brought by a corporation necessarily results to all the shareholders equally, even where a portion of them were parties to the wrong, or have, by acquiescence, forfeited their equitable claims to redress. And this result is not, as a rule, unfair. The only possible method of working out the rights of the parties in a case of this kind is to preserve the fiction of a separate corporate entity, and to enforce the collective and the individual rights and obligations of the shareholders separately. It is clear therefore, that the acquiescence of a shareholder in violation of the corporate rights, or even a participation in the wrong,would not deprive him of his interest in the cause of action belonging to the corporation as an entity. He would have a share in the benefits of a recovery, even although his personal liabilities should be thereby increased."

The record shows that the acquisition of the Mutual Light & Heat Company and the Diamond Ice Company, known as the Crane companies, was essential to the life of the power company. This was known to Mr. Latimer and his associates. They confess it, justifying the purchase of the competing companies in their own names by saying that the purchase was so made that the Crane companies might not fall into unfriendly hands. But the fact remains that they did not purchase it in their individual capacity, or at all, until they had a purchaser for the property at such figure as they might choose to put upon it. They controlled the stock of the buying as well as the selling corporations. They took no chances. As officers of the power company, they had a right to purchase the competing companies, of course, but only for the benefit of the power company; for equity will not allow them either to buy the competing companies which were admittedly in a position to destroy the power company, and thus take the work of destruction in their own hands in defiance of their duties as trustees, or, as they did in this case, turn the prop-

erty over to the power company at a greatly increased price and to their personal profit. The transaction should be held to have been made for the benefit of their principal.

In *Simmons v. Vulcan Oil & Min. Co.*, 61 Pa. St. 202, 100 Am. Dec. 628, 630, the court quoted from Lindley on Partnership, as follows:

"Judging from recent events and disclosures, nothing seems more common than for a person in getting up a company to obtain for the company property of which it is in want, and try and make the company pay him more than he gave for it. Such a transaction can never stand. There may undoubtedly be a valid sale to a company by persons engaged in getting it up; but once let it be shown that the alleged vendor obtained the property when it was his duty to obtain it for the company, and it immediately follows that he cannot, without the fullest disclosure on his part, charge the company with more than he actually gave;"

citing *Bank of London v. Tyrrell*, 5 Jur. N. S. 924, and *Great Luxembourg R. Co. v. Magney*, 25 Beav. 586.

In Thompson on Corporations (2d ed.), § 1246, it is said of the duties owing a corporation by the directors, that:

"Well-settled rules forbid them acquiring for themselves the property which it is their duty to acquire for the corporation and which is necessary for its purposes. It is said that such dealing would be equally as objectionable as purchasing from the corporation land which it was their duty to sell on its behalf. 'In respect to this class of dealings, directors of corporations stand upon the same footing as ordinary trustees.' It is a familiar rule that a trustee is disqualified to act by the intervention of a personal interest in the performance of his duties as such trustee; and such trustee is not permitted to obtain title to property where he has any duty to perform which is inconsistent with the character of a purchaser on his own account. The rule was stated by the supreme court of Utah as follows: 'The president and board of directors of a corporation are trustees, and act in a fiduciary capacity for its stockholders and while doing so are forbidden, in equity, to acquire any interest in a property hostile to the interests of the stockholders.' Officers acting as agents of a railroad corporation cannot be permitted while acting as

such, to buy lands ostensibly for their corporation and take conveyances to themselves for the purpose of reselling it to the corporation at an advance. Thus, the law will not permit directors of a corporation formed for the purpose of constructing a railroad, whose duty it is to acquire the right of way, to expend the funds of the corporation in making expensive improvements upon land necessary for the roadway, but which the corporation has not acquired the right to use, and at the same time to purchase the identical land in their individual right, and avail themselves of the title thus acquired to make extortionate demands upon the company for the use of such land. The rule as to the duty of directors in such cases has been stated thus: 'It is a breach of their fiduciary obligations which equity will not tolerate for such officers, in antagonism to the corporate interest, to oust the corporation from beneficial property rights which ought to be preserved to it by acquiring the property themselves. Derelictions of this kind are treated as a fraud on the corporation from which equity will raise a constructive trust in its favor.' On this principle, the officers of a corporation were not permitted to purchase lands on which the corporation had a lease. A director will not be permitted to act in hostility to the corporation and to acquire for his own benefit a lease of the premises occupied by such corporation or of premises necessary for its use. In such a case he will be treated as trustee of the lease so acquired by him."

In *Pepper v. Addicks*, 153 Fed. 383, at page 405, the court, speaking to the same subject, says:

"His liability rests upon the fundamental principle that one who occupies a position of trust and confidence—such as the president, or a director, of a corporation—shall never be permitted to abuse his official position by dealing with the corporate property for his private gain. If he so deals, by whatever tortuous devices, his acts are voidable if his trail can be followed, and he may be called upon to account for the profits that he has wrongfully made. If authority is needed for so plain a proposition, it may be found in *Wardell v. Railroad Co.*, 103 U. S. 651; *Fox v. Mackreth*, 1 Lead. Cas. Eq. (4th Am. Ed., Hare & Wallace's Notes) 237 et seq.; *McCants v. Bee*, 16 Am. Dec. 616, note; *Wilson v. Brookshire*, 9 L. R. A. 792, note; *Hindman v. O'Connor*, 13 L. R. A. 490, note; 4 Thompson, Corporations, §§ 4672, 4674."

In this case the promoter of the deal was the president of the corporation and also a director. He controlled 26,792 shares of stock. A majority of the directors of the corporation were interested in the syndicate and profited thereby. Members of the syndicate had control of 30,551 shares of the total 35,000. It is because of situations like this that courts have intervened and frowned upon all attempts of favored stockholders and officers of corporations to enrich themselves at the expense of their companies.

Much has been said about a full disclosure of the facts. It is utterly immaterial and should in no way affect the issue. That the syndicate should make a full disclosure to the power company was a mere pretense to satisfy the law, for the men composing the syndicate were at the same time the majority stockholders of the power company. They were merely passing the property from their right hand to their left. They disclosed to themselves only what they already knew, and did what they would not have undertaken to do if they had not been in control with power to receive the property. When the same man buys and sells, what comfort to the minority stockholder or the corporate entity is there in finding that, precedent to the transfer, he made a full disclosure of the facts—to himself? The record in this case shows simply an artful deal in high finance, and the profit, less a just return to the promoters of the scheme, for the use of the money advanced; and such expenses or expenditures as were put out for the maintenance of the Crane companies should be covered back into the treasury of the power company. It should not be possible, for it is against the policy of the law, to defeat these just principles by bookkeeping methods which can at best cover the real transaction with a transparent veil.