[No. 16222. Department One. April 12, 1921.]

## A. J. WESTLAND *et al., Respondents,* v. POST LAND COMPANY, *Appellant.*[1]

APPEAL (366) — REVIEW — UNDISPUTED EVIDENCE. Where the sole question on appeal is the proper conclusion to be drawn from practically undisputed evidence, and there is no question of the credibility of witnesses or of the weight to be given to their testimony, the duty of deciding the proper conclusions to be drawn from the evidence is imposed on the appellate court, though they may be contrary to the findings of the trial court.

CORPORATIONS (128)—OFFICERS AND AGENTS—DEALINGS WITH CORPORATION. A contract entered into by an individual with a corporation of which he is the chief stockholder and president, while subject to close scrutiny by the courts for fraud and overreaching, is not necessarily illegal.

FRAUD (22)—EVIDENCE—SUFFICIENCY. The purchase of a printing press by an individual and his lease thereof to a printing company of

[1]Reported in 197 Pac. 44.

which he was a majority stockholder and president, and a later sale of the lease and press by the printing company to a land company of which the same individual was a majority stockholder and president, was valid as against the creditors of the printing company in the absence of a showing of fraud.

Appeal from a judgment of the superior court for Snohomish county, Alston, J., entered July 6, 1920, upon findings in favor of the plaintiffs, determining the ownership of property in an action to foreclose a chattel mortgage, tried to the court. Reversed.

*Coleman & Fogarty,* for appellant.
*Williams & Davis,* for respondents.

Bridges, J.—The question involved in this case is the ownership of a certain printing press. The facts not denied or clearly proven are as follows: On, before and after December, 1916, the Morning Tribune Company, a corporation, owned and published a newspaper in Everett. One A. S. Taylor was its majority stockholder and president. His brother, Stewart A. Taylor, was its manager. The appellant, Post Land Company, was also a corporation, of which A. S. Taylor was the majority stockholder and president. While Mr. A. S. Taylor was the chief owner of the Tribune Company, he did not reside in Everett, but had his residence and business elsewhere.

The Tribune Company was in great financial distress. It was about to lose its only printing press, for the want of which, or some other press, it would be unable to issue its paper. Under these circumstances, A. S. Taylor began negotiations in Chicago for the purchase of a second-hand press. These negotiations resulted in the purchase of a press in the name of Stewart A. Taylor for $2,500, $250 of which were paid down in cash by A. S. Taylor, and he procured his brother to execute

promissory notes for the remainder of the purchase price, to wit: $2,250, there being one note for $60 and interest, payable each month subsequent to December, 1916, until the whole of the balance of the purchase price was thus paid. The last note, however, was for $90 instead of $60. The interest on all these notes was six per cent. Stewart A. Taylor gave a chattel mortgage on the printing press to the Chicago concern to secure these notes.

. On the same day the purchase of the printing press was consummated, Stewart A. Taylor, at the request of his brother, A. S. Taylor, leased it to the Morning Tribune Company, the latter company signing the lease through A. S. Taylor, its president. The lease provided that the Tribune Company should monthly pay $75 rental, and such payments were to be made on the 6th day of each month, which was the same day of the month that the various notes were to mature. It was also to keep the press in repair and pay the taxes on it during the life of the lease, which was for three years.

In 1918, Stewart A. Taylor, again acting for and at the suggestion of his brother, A. S. Taylor, sold and assigned the Tribune Company lease to the Post Land Company, and on the same day made a bill of sale of the printing press to that company. Before the printing press was purchased, the Tribune Company had issued its bonds in the sum of $25,000, secured by a mortgage on all its property and all which it should subsequently own. Later, and long after the purchase of the printing press, and after the transfer of it to the Post Land Company, the Tribune Company, being in default on its bonds, suit was brought for the foreclosure of the mortgage given by it and a receiver was

appointed. The receiver did not include in his inventory the printing press in .question, and this was a proceeding in the original foreclosure case to determine the ownership of that property.

The Tribune Company did not make monthly payments of $75 as provided by its lease, but paid monthly an amount equal to the face of the notes given by Stewart A. Taylor, with the interest thereupon. For the most part, these monthly payments were made directly to Stewart A. Taylor, who in all of his connections with this affair had acted for and on behalf and as agent of his brother, A. S. Taylor, so that, in effect, we may consider that it was A. S. Taylor who bought the press and leased it to the Tribune Company, and who sold it to the Post Land Company. The lease given by Taylor to the Tribune Company was in the usual form, and the rental agreed to be paid by that company was reasonable. On this state of facts the trial court found, "that the purchase of said printing press by the said A. S. Taylor and the lease of the same to the Morning Tribune Company was a fraud on said Morning Tribune Company," and entered a judgment to the effect that the Tribune Company was the owner of the press, and that the Post Land Company had no right, title, interest or lien upon it. It has appealed from that judgment.

This case does not fairly come within the settled rule of this court that we will not overturn the findings of the trial court, based upon facts, unless the same appears to us to be clearly against the preponderance of the evidence. That rule is based upon the theory that there is a conflict in the testimony, and that the trial court, having the witnesses before it, is in better position than we to arrive at the truth. But here prac-

tically all of the facts are undisputed, and it is not a question of the credibility of the witnesses or of the weight to be given to their testimony. The sole question here is, what is the proper conclusion to draw from the practically undisputed evidence. Under these circumstances, the law imposes upon us the duty of deciding for ourselves the proper conclusion to be drawn.

So looking at the question, we are unable to affirm the judgment. It was vigorously pressed on the trial court that a binding contract cannot be made where one deals with a corporation which acts through himself as its chief stockholder and president. A deal made in that manner is not necessarily unenforcible. Suppose it were confessed in this transaction the company had received the best of the deal, certainly neither it nor Taylor could be heard to attack the agreement simply because Taylor, as an individual, had dealt with the Tribune Company, acting through himself as its sole representative. While the courts will closely scrutinize a transaction of this kind and may even suspect fraud and overreaching, yet in this state there is no insurmountable legal obstacle standing in the way of thus doing business. *Roy & Co. v. Scott, Hartley & Co.,* 11 Wash. 339, 39 Pac. 679; *Baker v. Seattle-Tacoma Power Co.,* 61 Wash. 578, 112 Pac. 647, Ann. Cas. 1912C 859; *Budd v. Walla Walla Printing Co.,* 2 Wash. Terr. 347, 7 Pac. 896; *Strohl v. Seattle Nat. Bank,* 25 Wash. 28, 64 Pac. 916.

It is true there were three trustees of this corporation, of which A. S. Taylor was one, and there is no affirmative showing that they authorized this lease to the Tribune Company; yet, on the other hand, there is no affirmative showing that they did not authorize it. But there is such a thing as authorization by knowledge

and acquiescence. Here the company held and used and paid rent on this press for almost, if not quite, three years. It is inconceivable that its trustees could all that time be ignorant of this lease transaction, yet there is no record of the company or any of its trustees or officers ever raising any objections. Indeed, we do not understand that even now any of them are objecting.

But it is argued that Taylor bought the press for the company. That he bought it that the company could have the use of it, there can be no question, but that is far from saying that he bought it and gave it to the company. But it is argued the lease should be construed as a contract of purchase, because the rental payments were to be made at the same time the various notes were to become due, and that the $75 per month rental was not paid, but the exact amount of each of the notes was paid, and that in this way the company actually paid all the notes, and thus paid for the press, and that Taylor cannot now claim ownership of the press which has thus been paid for by the company.

But the question is not what the transaction was worth to Taylor, but what was it worth to the Tribune Company. The latter was without a press and without credit and was unable to help itself. It could not buy a press and pay cash for it because it did not have, and could not raise, the money; it could not buy on credit, for seemingly it had none of the latter, and everything it had and might thereafter own was covered by a large mortgage. Under these circumstances, a lease of a press was a great advantage to it. But Taylor did not take advantage of its necessities, because all the testimony shows that the rentals to be paid were fair and reasonable. We have not seen a word in the testimony even tending to indicate to the contrary. Besides this,

while the rentals have discharged the purchase notes, Taylor has never in any manner been repaid the cash payment of $250 made by him when he bought the press. The circumstances of the company having made monthly payments of amounts equal to each of the notes, instead of the stipulated rent of $75 per month, is not controlling. The testimony shows that it was unable to pay more and, in fact, often the Taylors helped it to raise even the payments it made.

Taking the case as a whole, we are unable to find that there was any fraud or that the lease was anything other than on its face what it purported to be. At this time the press belongs to the Post Land Company and the receiver is not entitled to claim it.

Judgment reversed.

PARKER, C. J., HOLCOMB, FULLERTON, and MACKINTOSH., JJ., concur.