[No. 28680. *En Banc.* November 25, 1942.]

MABEL F. DOKE, *Individually and as Administratrix, Appellant,* v. UNITED PACIFIC INSURANCE COMPANY, *Respondent.*[1]

[1]Reported in 131 P. (2d) 436.

*L. C. Brodbeck* and *S. Harold Shefelman,* for appellant.

*Bruce Bartley* and *Max R. Nicolai,* for respondent.

*The Attorney General* and *Max Kaminoff, Assistant, amici curiae.*

#### ORDER

The above entitled appeal was heard by Department One on June 8, 1942, and an opinion was prepared by the late Mr. Justice John F. Main, which failed to receive the approval of two of the members of that department. The case was thereupon assigned for rehearing *En Banc* on September 10, 1942. Judge Main was unable to be present at the rehearing, and the eight judges sitting were unable to arrive at a decision. The case was again reheard *En Banc* on November 23, 1942.

At this hearing, Mr. Justice Driver was absent; but, on consideration that he had examined the briefs and heard the oral argument on June 8th and again on September 10th, counsel for both appellant and respondent stipulated in open court that he might participate in the decision.

Five members of the court having now approved the opinion as originally written by Judge Main;

IT IS ORDERED that the same be adopted as the opinion of the court, and that it be attached hereto and filed forthwith.

By the Court this 25th day of November, 1942.

JOHN S. ROBINSON
Chief Justice

MAIN, J.—This action was based upon a policy of insurance issued by the United Pacific Insurance Company, insuring all members of the national guard of this state for loss of life, total and temporary disability, and for all necessary medical attendance, including hospitalization, nursing, etc. The cause was tried to the court without a jury, and resulted in findings of fact from which it was concluded that no recovery could be had upon the policy. From the judgment entered dismissing the action, the plaintiff appealed.

In response to a letter from the then adjutant general of this state, the respondent, the insurance company, issued a policy which, after reciting that it covered each of the enlisted men of the national guard of the state of Washington, under the heading "The Insuring Clause," contained this paragraph:

"This policy insures against loss or disability resulting directly and exclusively of all other causes, from accidental bodily injury sustained during the term of this policy and caused by service classed as incurred in line of duty as a National Guardsman, including guard duty, participation in drills, parades, practice or

instruction in an armory or in the field when with his organization under the command of officers, including the annual encampment or while travelling to and from encampment, hereinafter referred to as 'Such injury.' "

One Judson H. Doke, who will be referred to as Judson, was an enlisted member of the national guard of this state. September 18, 1940, while he was crossing the intersection of 15th avenue and Capitol way, in the city of Olympia, he sustained a severe head injury, from which he died seventy-three days later. After his death, his mother, Mabel F. Doke, was appointed administratrix of his estate and brought this action for the benefit of herself as surviving mother and for the benefit of his estate. The evidence does not disclose what caused the injury. The national guard at Olympia assembled every week at the armory on Wednesday evening at seven-thirty for the purpose of drill. Judson lived with his mother, who resided a block or two from the intersection where the accident occurred.

The first question is whether, at the time he was injured, Judson was on his way to attend a drill which was to take place that evening. The injury occurred at about seven o'clock, or a little later in the evening. It was his usual custom to take a city bus at that intersection at about ten minutes past seven in order to go to the armory.

Upon the trial, certain testimony was offered by the appellant, which, it was claimed, tended to show that, at the time Judson was injured, he intended to go to the armory. This testimony was received over objection, at the time the court expressing some doubt as to its admissibility. One witness, by whom Judson was employed, testified that Judson called at the office, on the evening of the accident, at about six-fifteen, and suggested that his employer take dinner with him; but, for reasons not here material, the employer could

not do so. Judson then went across the street and took a friend to dinner with him. Before he left the office, this witness testified:

"However, I asked him what he was going to do in the evening and he said he had to go to National Guard."

The witness further testified that Judson said he would have to hurry, "that he had to go up to the house [his home] and pick up his hat."

Mrs. Doke, the mother of Judson, testified that Judson called her on the phone about five-thirty and asked if she had anything special for dinner. Receiving an answer that she had not, he stated: "I will be home in a few minutes, as soon as I eat," and that he had to go to the armory. Mrs. Doke left a note on the table in the house and went downtown to a show. When she returned from the show, the note was gone, and she saw it again for the first time when it was turned over to her at the hospital where Judson was taken after his injury.

Another witness and a very close friend of Judson's testified that he had a telephone call from Judson on the evening in question in which he said that he was ready to leave for the armory and would get on the bus at the corner of 15th avenue and Capitol way, and this witness and another friend were to get on the same bus at 11th and Capitol way. The route of the bus, in going in the direction of the armory, would cross 11th avenue after it had left 15th avenue. After the telephone call was concluded, this witness and the friend went out to take the bus to go to the armory a few minutes later, and the bus which Judson was to take and on which they were to meet him passed by, but he was not on it.

The commanding officer of the Olympia unit of the national guard testified that there was an order in

effect that all members of the national guard should attend the meetings, and that Judson had a good record of attendance. On the evening of the eighteenth of September, Judson not appearing, the officer called his home about seven-thirty and got no response. This officer further testified that, if a member was not present, he was technically absent without leave and was subject to disciplinary measures.

Another witness, who was formerly regimental officer of the battery stationed in Olympia and at the time of the trial was a colonel in the United States army, testified that Judson was a member of the 205th Coast Artillery Battery, and he further testified as follows:

"Q. A boy that belongs to the National Guard such as Judson H. Doke, what duties devolved upon him by virtue of that order or command to be at the Armory at a certain time? A. Well, he is enlisted as a member of the United States Army and he has to appear there just as much as any individual who enlists in the regular army. He has to appear for different functions, he is subject to the same disciplinary action. He may be court martialed for not appearing. He may be jailed, if necessary, for not obeying the order."

The former adjutant general of this state, after stating that the authority of the officers commences over national guardsmen when they report at the designated place of assembly, however added this:

"If he fails to report then he can be punished under both the Federal and State law for failure to report for duty."

The court, having concluded that the testimony relative to Judson's state of mind and his movements on the evening of September eighteenth was not properly admissible, in deciding the case, disregarded it.

[1, 2] We think the testimony was properly admitted and should have been considered in determining

the case. It tended to show Judson's then state of mind by his own declarations, and that, at the time of his injury, he was proceeding in his ordinary course to the armory to attend the Wednesday evening drill.

The design or plan to do a specific act is relevant to show that the act was probably done as planned. The design or plan, being in the nature of a fact to be proven, may be evidenced circumstantially by a person's conduct, and, as a state of mind, the plan or design may also be shown by the person's own statements as to its existence.

In 6 Wigmore on Evidence (3d ed.) 79, § 1725, it is said:

"It has already been seen (*ante,* § 102) that the existence of a *design* or *plan to do* a specific act is relevant to show that the act was probably done as planned. The design or plan being thus in its turn a fact to be proved, may be evidenced circumstantially by the person's conduct (*ante,* §§ 253, 300). But as a condition of mind, the plan or design may also, it is clear, be evidenced under the present Exception by the *person's own statements* as to its existence.

"The only limitations as to the use of such statements (assuming the fact of the design to be relevant) are those suggested by the general principle of this Exception (*ante,* § 1714), namely the statements must be of a *present existing state of mind,* and must appear to have been made in a natural manner and not under circumstances of suspicion."

In a footnote, many authorities are stated as sustaining the text, two of which are the cases of *State v. Power,* 24 Wash. 34, 63 Pac. 1112, 63 L. R. A. 902, and *State v. Paschall,* 182 Wash. 304, 47 P. (2d) 15. An examination of these cases shows that this court is in accord with the text writer.

On this branch of the case, we conclude that Judson, at the time he was injured, was on his way to the armory to attend drill.

■■ The next question is whether Judson was "in line of duty" prior to the time that he would reach the armory.

In 7 Opinions of Attorneys General 149, at page 161, Caleb Cushing, the then attorney general of the United States, made this statement as to the criterion test to determine whether one in the military service was at a particular time "in the line of duty":

"Instead of any of these imperfect expressions, the statute employs a phrase which is definite, though comprehensive, 'the line of duty.' He who contracts disease or dies in consequence of the ordinary performance of his military duty, or in the performance of any special act of military duty, whether at the moment of performance he were on duty or off duty, in active service or on furlough, of habits virtuous or habits vicious, gallantly fighting his country's enemy or expiating an offence in the guard-house or prison bay,— he, I say, who, in these or any other circumstances, contracts disease in the performance of an act of duty, contracts it 'in the line of his duty.' On the other hand, neither the bad man, who dies of his incorrigible vices, nor the good man, who, at the full maturity of blameless life, dies in the course of nature of any of the maladies incident to old age, can be said to die of 'disease contracted while in the line of duty.' In fine, the phrase 'line of duty' is an apt one, to denote that an act of duty performed must have relation of causation, mediate or immediate, to the wound, the casualty, the injury, or the disease, producing disability or death."

That criterion has been approved in *Rhodes v. United States,* 79 Fed. 740; *Moore v. United States,* 48 Ct. Cl., 110; *Hutchens v. Covert,* 39 Ind. App. 382, 78 N. E. 1061; and in the war risk insurance act interpretation of the phrase "in the line of duty" in 32 Opinions of Attorneys General 12.

All of the authorities just cited related to military service in some form in the army of the United States. However, we see no reason why the phrase "in line of

duty" should not be given the same meaning when it appears in an insurance policy covering the members of the national guard of the state. It is true that the insurance paragraph in the policy did not only use the phrase "in line of duty" but uses the phrase "service classed as incurred in line of duty" as a national guardsman. The policy nowhere specifies or defines what is meant by "service classed as incurred in line of duty," and what is the true meaning to be given to that phrase is rather a puzzling question. Had the policy only used the phrase "in line of duty," its meaning would have been clear. The presence of the words "classed as incurred" certainly renders the clause ambiguous. That being true, the meaning and construction most favorable to the insured must be applied, even though the insurer may have intended another meaning, because the insurer, and not the insured, is the author of the instrument. *Kane v. Order of United Commercial Travelers,* 3 Wn. (2d) 355, 100 P. (2d) 1036; *Zinn v. Equitable Life Ins. Co.,* 6 Wn. (2d) 379, 107 P. (2d) 921.

As we view the case of *Blanck v. Pioneer Mining Co.,* 93 Wash. 26, 159 Pac. 1077, it does not furnish any aid in determining the meaning of the insurance clause in the policy here involved.

Our view is that Judson was "in line of duty" at the time he was injured.

The next question is whether the burden was on the appellant to show the manner in which the accident occurred.

In 29 Am. Jur. 1082, § 1443, after stating the general rule that the plaintiff in an accident insurance policy must prove that the death or injury for which the action is brought must be caused by accidental means, within the terms of the policy, this is said:

"In this respect, the authorities support the general rule that in an action on a policy insuring against death

caused solely by external, violent, and accidental means, the burden of proof is on the plaintiff to show from all the evidence that the death of the insured was the result of accidental as well as external and violent means, but that where death by unexplained, violent, and external means is established, a presumption is thereby created or prima facie proof is thereby made of the fact that the injuries were accidental, without direct and positive testimony on that point, since the law will not presume that the injuries were inflicted intentionally by the deceased or by some other person."

The doctor who was called after Judson was taken to the hospital stated that he had "a basal fracture of the skull, an extensive brain laceration causing the patient to be knocked into coma at the time of accident and remained in coma until his death seventy-three days later." That diagnosis undoubtedly shows that the injury was caused by violent and external means. Judson having at no time regained consciousness, and, this being established, as stated in the text last quoted, a presumption was created and *prima facie* proof was thereby made of the fact that the injuries "were accidental, without direct and positive testimony on that point, since the law will not presume that the injuries were inflicted intentionally by the deceased or by some other person." The burden, therefore, rested upon the respondent to show that the injury and death were caused by some act which was not covered by the policy. *Hill v. Great Northern Life Ins. Co.*, 186 Wash. 167, 57 P. (2d) 405.

Cases such as *Lavender v. Continental Life Ins. Co.*, 143 Wash. 201, 253 Pac. 595, and *Wright v. Continental Life Ins. Co.*, 146 Wash. 665, 264 Pac. 410, which are based upon policies of very limited liability and specify the particular things that would result in liability, are not applicable here.

In conclusion, we will note the fact that the

respondent calls our attention to the general rule that, where cases are tried to the court without a jury, and the court makes a finding upon conflicting evidence, it will not be disturbed, unless this court can say that the preponderance of the evidence is against the finding. That rule has no application here, because there is no substantial dispute in any of the material testimony, and, that being the case, as was observed in *Westland v. Post Land Co.*, 115 Wash. 329, 197 Pac. 44, this court has the duty of determining the conclusion to be drawn.

The appellant was entitled to recover, not only for the loss of life, but for all necessary expenses incurred subsequent to the accident and prior to the death of Judson, in so far as they were included in the policy.

The judgment appealed from will be reversed, and the cause remanded to the superior court with direction to enter a judgment for the appellant, as herein indicated.

BEALS, J. (concurring)—I am in accord with the foregoing opinion written by the late Judge John F. Main, and desire to supplement the same by referring to some provisions of our state constitution and statutes which seem to me relevant.

Art. X, § 5, of our state constitution, reads as follows:

"The militia shall, in all cases, except treason, felony and breach of the peace, be privileged from arrest during the attendance at musters and elections of officers, and in going to and returning from the same."

Rem. Rev. Stat., § 8511 [P. C. § 3765-57], reads in part as follows:

"No person belonging to the military forces of this state shall be arrested under any civil process while going to, remaining at, or returning from any place at which he may be required to attend military duty. . . . Any person belonging to the military forces of the state while going to or returning from any parade, encampment, drill or meeting which he may be

required by law to attend shall be allowed to pass free through all toll-gates and over all toll-bridges and ferries."

Rem. Rev. Stat., §§ 8548, 8549 [P. C. §§ 3765-92, 3765-93], being articles 15 and 16 of the articles governing the organized militia of Washington, read as follows:

"§ 8548. Art. 15. *Absence from duty.* Any enlisted man who absents himself from duty without leave shall be punished as a military court may direct.

"§ 8549. Art. 16. *Nonattendance or leaving military exercises.* Any officer or enlisted man who fails, except when prevented by sickness or other necessity, to repair at the fixed time to the appointed place of parade, exercise or other rendezvous, or goes from the same without leave, before he is dismissed or relieved, shall be punished as a military court may direct."

By Rem. Rev. Stat., § 8469 [P. C. § 3765-14], the senior commanding officer at any station of any portion of the organized militia may, upon written request of a superior court judge, sheriff, or mayor, order out the organization at that station and cause them to perform such duties as the circumstances shall require. Wherever a member of the national guard may be when receiving such an order, he must at once proceed to the designated rendezvous and report for duty. By § 8471 [P. C. § 3765-16], it is made an offense to fail to obey such an order.

In the case at bar, it appears that, on the evening of the accident, the organization of the national guard of which Doke was a member was to meet at the armory in Olympia, for a stated drill. Doke's presence with the organization on that evening was required by general order, which he was obligated to obey, just as he was obligated to obey any special order calling him to duty pursuant to § 8469, above referred to. Had he failed to be present at the drill without adequate ex-

cuse, he would have been subject to punishment by court martial, pursuant to §§ 8548, 8549, *supra*. On the day of the accident, Doke was at his home station, going about his usual business affairs. It seems to me clear from the evidence that, just prior to the accident, Doke left his home for the purpose of proceeding to the armory to participate in the training of the organization of the national guard of this state of which he was a member.

Respondent insurance company itself prepared the policy of insurance upon which this action is based. It undertook to protect the insured from loss or disability resulting from accident "caused by service classed as incurred in line of duty as a National Guardsman." If, pursuant to the portions of the constitution and statutes of this state above referred to, a member of the national guard while at his home or elsewhere receives from his commanding officer a special order to report for duty at his armory or elsewhere, he must at once proceed to obey that order, and in so obeying it, is, in my opinion, clearly in line of duty. I am convinced that the same rule should apply to such a situation as is presented by the evidence in the case at bar. The emergency was less, but the duty was in nature the same.

Upon the record before us, I am convinced that Doke, at the time he was injured, enjoyed the protection of the policy of insurance sued upon.

I accordingly concur in the result reached in the foregoing opinion.

STEINERT, J. (dissenting)—The policy here in question was issued to the national guard of the state of Washington in consideration of the payment of a biennial premium of three dollars for each enlisted man. The insuring clause reads:

"This policy insures against loss or disability resulting directly and exclusively of all other causes, from accidental bodily injury sustained during the term of this policy and caused by service classed as incurred in line of duty as a National Guardsman, including guard duty, participation in drills, parades, practice or instruction in an armory or in the field when with his organization under the command of officers, including the annual encampment or while travelling to and from encampment, hereinafter referred to as 'Such injury'."

Another provision of the policy provides:

"In the event of the National Guard of Washington being called into the federal service as a result of the mobilization of the Army of the United States or any part thereof, this policy will not be considered as covering those men so ordered into the federal service."

It is therefore apparent that for a premium of one dollar and fifty cents a year the respondent company assumed only a limited liability. The policy covered only loss or disability resulting directly and exclusively from accidental bodily injury *caused* by service classed as incurred *in line of duty as a national guardsman.* The policy is very clear as to what the "line of duty" shall include. It says:

". . . including guard duty, participation in drills, parades, practice or instruction in an armory or in the field when with his organization under the command of officers, including the annual encampment or while travelling to and from encampment."

To say that the "including" clause is merely an enlarging one, intended to furnish an added protection which otherwise would not be covered by the policy is, in my opinion, wholly illogical and unwarranted. The essential duties of a national guardsman are those specified in the including clause. It would be wholly out of place to enumerate them as being duties other than those ordinarily included in the "line of duty" of such guardsmen.

The record shows that national guardsmen are paid only for drills actually attended; that they receive no transportation allowances for going to and from the armory; that a national guardsman is essentially a civilian, and not a soldier; and that his military duty begins only when he enters the armory. His orders to report simply require him *to be* at the armory. How he gets there is of no concern to his superior officers.

The situation presented by this case is not to be compared with that of a regular soldier on furlough, because the provisions for furloughs or leaves of absence are a part of the disciplinary regulations of the military service. A soldier on furlough is still a soldier in the service, subject to military command.

I think that the trial court was correct in holding that the deceased, at the time of receiving his injuries, was not in the line of duty of a national guardsman within the meaning of the policy and, further, that his death was not *caused* by such service. For these reasons I think the judgment should be affirmed.

MALLERY and JEFFERS, JJ., concur with STEINERT, J.

SIMPSON, J. (dissenting)—The judgment in this case should be affirmed for the reasons given by Judge Steinert and for the further reason that the admissible evidence produced at the trial failed to show that the insured was on his way to the armory at the time of his injury.

ON REHEARING.

[*En Banc.* March 18, 1943.]

PER CURIAM—Upon a rehearing *En Banc,* a majority of the court adheres to the opinion heretofore filed herein.