[No. 49448–7.  En Banc.  March 15, 1984.]

LEONARD J. MIOTKE, ET AL, *Respondents,* v. THE CITY OF SPOKANE, ET AL, *Appellants.*

*James C. Sloane, Corporation Counsel, Robert G. Beaumier, Jr.,* and *Pat J. Dalton, Assistants,* for appellant City of Spokane.

*Kenneth O. Eikenberry, Attorney General, Charles B. Roe, Jr., Senior Assistant,* and *Charles W. Lean* and *Robert V. Jensen, Assistants,* for appellant State.

*Carl Maxey* and *Mark Bennett* (*Michael C. McClintock,* of counsel), for respondents.

PEARSON, J.—This appeal arises from litigation which followed the discharge of raw sewage into the Spokane River. The trial court awarded plaintiffs, the owners of waterfront property, a total of $245,000 in damages and $88,500 in attorney fees. Defendants, City of Spokane and the Department of Ecology, appealed the awards of both damages and attorney fees, and plaintiffs cross–appealed, seeking increased damages and attorney fees.

This case raises a plethora of issues, many of them novel, at least in this jurisdiction. Stated simply, however, the most important question raised by the appeal is whether any cause of action lies against governmental units for injuries allegedly caused by their actions taken in violation of various environmental laws. We hold in this case that discharging raw sewage into the Spokane River in violation of a waste disposal permit is a wrongful act which gives rise to an action for nuisance. We affirm the trial court's award of damages for injuries sustained by plaintiffs and recoverable under a nuisance theory.

In further holdings, we reject plaintiffs' argument that violations of the State Environmental Policy Act of 1971 (SEPA) give rise to an additional action in damages for infringement of plaintiffs' fundamental and inalienable right to a healthful environment; we reject defendants' arguments that plaintiffs' actions are precluded by the doctrine of eminent domain, by the discretionary nature of the

decision to discharge the sewage into the Spokane River, or by the tort claims statute (RCW 4.92.110); and finally, we adopt the "private attorney general" theory and affirm the trial court's award of attorney fees for the injunctive phase of the litigation.

Plaintiffs are the owners of lakefront properties below a dam on the Spokane River. They filed suit against defendants in December 1975, after untreated sewage was discharged in October 1975 into the Spokane River during construction of a new sewage treatment facility for the City of Spokane. Plaintiffs requested an injunction against future dumping of untreated sewage into the river, and damages for injuries allegedly resulting from the October 1975 discharge.

Over the subsequent years, three distinct phases of litigation took place. The first phase comprised the trial court's determination of whether the injunction should issue and whether defendants were liable in damages to plaintiffs. A hearing on these issues was held in December 1976. The trial court, on January 31, 1977, issued an order enjoining further bypasses of untreated sewage, and on April 4, 1978, entered 47 findings of fact and 38 conclusions of law. The gist of these findings and conclusions was that defendants were liable in damages to plaintiffs.

The second phase of litigation was concerned principally with a single factual issue: whether algae blooms in 1976, 1977, and 1978 were caused by the 1975 bypass of untreated sewage into the Spokane River. On July 20, 1979, the trial court in a memorandum opinion concluded that the algae blooms were not caused by the 1975 bypass. No appeal is taken from this phase of the case.

The third phase of the litigation was the determination of damages. The trial court heard evidence from plaintiffs and several expert witnesses. On May 23, 1980, in a memorandum opinion, the trial court awarded the 11 plaintiff married couples a total of $245,000 damages, together with $88,500 in attorney fees, for phase 1 of the litigation, and $37,096.05 costs. Formal findings of fact and conclusions of

law were entered on November 2, 1980, incorporating the substance of the memorandum opinion. These findings and conclusions were set forth as a numerical continuation of those of April 4, 1978, and made a total of 82 findings and 59 conclusions.

In this appeal and cross appeal, the parties raise issues relating to virtually every aspect of this protracted and complex litigation. Many of the trial court's findings of fact are disputed by the parties, and there are challenges to the sufficiency of the evidence supporting the trial court's conclusions. It is, therefore, necessary to consider in some detail the facts of this case.

The facts may conveniently be grouped as follows: first, the circumstances giving rise to the construction of the new sewage facility in Spokane; second, the events leading up to the bypass itself; third, the procedural background to the first phase of the litigation, and the immediate results of that litigation; fourth, the facts relevant to the second (algae bloom) phase of the litigation; and finally, the testimony and other evidence on which the trial court based its decisions on the third phase of the litigation.

We begin with a brief review of the background to the 1975 bypass.

Spokane's sewer system was established in 1890, and has been expanded significantly since that time. The original system was a combination sewage and storm water system, designed to collect both sanitary sewage and storm water, and discharge it directly into the Spokane River. The discharge of raw, untreated sewage into the Spokane River resulted in substantial pollution of both the river and two artificial lakes created by concrete dams on the river: Nine Mile Reservoir and Long Lake.

The City's first sewage treatment plant was completed in 1958 and expanded in 1962. This was a primary treatment plant in which solid matter was allowed to settle out of the raw sewage in large settling basins. The solid matter was then disposed of in sanitary landfills and the liquid sewage (effluent) was released into the river after being treated

with chlorine. This process removed approximately 50 percent of the suspended solids, 50 percent of the biochemical oxygen demand, and 99 percent of the fecal coliform bacteria from the sewage prior to its being released into the river.

The primary treatment plant had sufficient hydraulic capacity to handle a maximum flow rate of about 60 million gallons per day (MGD). In dry weather, the average daily output of sewage was only 30 MGD. During times of rainfall or snowmelt, however, the capacity of the plant was often exceeded. At such times of excess flow, the treatment plant was bypassed to protect it from flooding and destruction, and raw sewage diluted with storm water was discharged directly into the Spokane River. Approximately 1.1 billion gallons of combined storm water and sanitary sewage each year was bypassed directly into the river in such circumstances.

In 1967, the predecessor agency to the Department of Ecology, the Washington Water Pollution Control Commission, adopted water quality standards. The classifications applied to the Spokane River and Long Lake are "Class A" and "Lake Class" respectively. WAC 173–201–080(95); WAC 173–201–070(4). The DOE, which was created in 1970 (RCW 43.21A), determined that the Spokane River and Long Lake failed to meet these water quality standards because the level of sewage treatment provided by the City of Spokane's primary treatment plant was inadequate. On March 28, 1973, the DOE ordered the City to modify the sewage treatment plant by June 30, 1976. The City, through its engineering consultant, Bovay Engineers, determined that the most cost effective measure available was to convert the primary treatment plant into a secondary treatment plant on the same site as the existing plant. A secondary treatment plant uses living organisms to break down the sewage and remove pollution, in addition to the physical and chemical processes used in primary treatment. The proposed new plant was also designed to remove phosphorus from the sewage. This was intended to limit algae

growth in the waters of the Spokane River, phosphorus being a nutrient of algae. Seventy–five percent of the funding for the new plant was provided by a grant from the United States Environmental Protection Agency (EPA).

The City was required by the National Environmental Policy Act of 1969 (NEPA) and by the State Environmental Policy Act of 1971 to submit environmental assessment statements to the EPA and to the DOE. A draft statement was prepared in June 1973, public hearings were conducted in July 1973, and the final environmental assessment was submitted to the EPA and DOE in September 1973. The final assessment recognized that the treatment plant might have to be bypassed during reconstruction of the headworks of the treatment plant, but declared that such a bypass would occur during maximum high water, when the assimilative capacity of the river is at its peak.

On January 2, 1974, the City of Spokane filed with the EPA and the DOE a declaration that the sewage plant modification was not a "major action significantly affecting the quality of the environment". The EPA issued its negative declaration on June 10, 1974.

The next step was the granting of a Waste Discharge Permit. The Federal Water Pollution Control Act Amendments of 1972 (Pub. L. No. 92–500, § 2, 86 Stat. 880 (1972), 33 U.S.C. § 1342 (1976 & Supp. 4, 1981)) created the National Pollutant Discharge Elimination System (NPDES) waste discharge permit program. Under this program, the EPA has authority to issue permits allowing the discharge of pollutants into federal waters. In 1973, the EPA delegated to the DOE authority to administer the NPDES program in this state. Regulations pertaining to the administration of this permit program were adopted by the DOE in September 1973, and are contained in WAC 173–220.

In November 1973, the City of Spokane submitted an application to discharge pollutants into the waters of the United States. RCW 90.48.162. After public notice and a hearing, the permit was granted on October 25, 1974.

NPDES Waste Discharge Permit WA–002447–3. The permit provided that the monthly average quantity of effluent discharged should not exceed 35 MGD. It required that records should be maintained on all treatment plant bypasses, both total and partial. It required further that whenever a facility expansion or process modification required increased discharge, a new application should be submitted, and no changes undertaken until a new permit issued. The permit allowed bypasses without a new permit when necessary to avoid facility damage.

A complete set of plans and specifications for the plant to provide for secondary treatment were submitted to the DOE in September 1974. The plans and specifications were approved in their entirety in January 1975 by both the DOE and EPA. In May 1975, contracts were signed with Hoffman Construction Company for the construction of the additions and modifications to the Spokane sewage treatment plant.

Construction began and progressed without material incident until September 18, 1975. On that date, Hoffman gave the City of Spokane 5 days' notice (as it was required to do by the construction contract) that it was about to begin work which would interfere with the normal operation of the existing primary sewage treatment plant. The work comprised construction of a bypass structure to facilitate subsequent construction and installation of a flow measurement device. The City by letter formally requested permission of the DOE to discharge raw sewage for 4 days, beginning September 29.

The DOE arranged a meeting on September 25, 1975, of representatives of the DOE, the City, and Bovay Engineers, to discuss alternatives to the proposed bypass of raw sewage. At this meeting, four alternatives were discussed and rejected: the storage of raw sewage until the work was complete; screening and chlorination of the sewage prior to discharge; performance of the work "in the wet"; and delay of the work until a higher river flow period in the spring.

Storage of the sewage was dismissed as economically

infeasible because it would require construction of holding tanks of 150 million gallons capacity. Screening and chlorination were dismissed because those processes have little or no practical disinfective effect on a moving flow of sewage. Construction "in the wet" was dismissed because of the danger to workers, and the fact that the flow measuring device could be installed only when the sewer line was dry. Delay of the construction was rejected for three reasons: First, it would result in additional expense; second, it would require primary treatment for a longer period, which was considered more harmful to the river than a bypass; and third, it would have resulted in completion of the project after July 1, 1977, the date which the City believed 33 U.S.C. § 1311(b)(1)(B) (1976) required completion of the secondary treatment plant.

On September 25, 1975, the DOE indicated that it would issue an order pursuant to WAC 173–201, authorizing the bypass. The DOE prepared an economic impact appraisal which concluded that the bypass would cause no irreversible or long–term effect on the water quality of the Spokane River. On October 3, the DOE issued Order DE 75–184, authorizing modification of water quality criteria during the period 12:01 a.m. October 6 through 5 p.m. October 10, 1975. The order permitted a discharge of raw sewage into the Spokane River for a period of 3 to 10 days, and required the City to make a public announcement that the bypass would take place.

On October 3, 1975, the City held a news conference with local television stations and newspapers explaining the necessity for the temporary bypass and its projected duration. Hoffman worked around the clock to complete construction and the bypass lasted approximately 3½ days. The DOE estimated that 100 million gallons of raw, untreated sewage were discharged during the bypass. The river flow at this time was approximately 2,500 cubic feet per second, a relatively low flow.

The first phase of the litigation began only days after the bypass, when plaintiffs filed the first of two lawsuits. This

action, filed on October 14, 1975, in Stevens County, sought a permanent injunction against both defendants and a declaratory judgment that the actions of the defendants were wrongful and illegal. The other action was filed on December 3, 1975, in Spokane County. This action comprised a petition for a writ of certiorari in which plaintiffs sought the following:

1. An injunction against further bypasses,

2. A declaration that the October 1975 bypass was tortious for failure to file an EIS, failure to obtain a new NPDES waste disposal permit, and failure to comply with the general waste disposal permit,

3. Damages under theories of negligence, nuisance, inverse condemnation, and strict liability and under statutory theories, and

4. Costs and attorney fees.

On December 19, 1975, the parties stipulated to removing the Stevens County action to Spokane County and joining the actions for further proceedings by writ of certiorari. The petition for a writ of certiorari was subsequently amended pursuant to a motion filed on June 18, 1976. The common law causes of action were dropped and the only remaining theories were based solely on statutory breaches. An order of consolidation was entered March 2, 1976. On June 18, 1976, plaintiffs filed in Spokane County claims for damages based on theories of trespass, private nuisance, and strict liability.

The first hearing took place before the Spokane County Superior Court on August 13 and 26, 1976. No live testimony was presented, but the court considered various affidavits submitted by the parties. Following this hearing, on November 24, 1976, the court issued a writ of certiorari

> bringing up for review before this court the evidence relevant and material to the October 6 through October 9 bypass, the legality or illegality of such bypass, and any resultant damages thereof . . .

The court also ordered that the trial on these liability issues was to be held on December 9 and 10, 1976, and the

trial on damages was to be set upon agreement at a later time.

The hearing on the injunction and liability issues began on December 9, 1976, and continued through March 21, 1977. On January 31, 1977, the court issued an order enjoining future bypasses of untreated sewage into the Spokane River. In September 1977, the trial judge indicated in a letter to counsel that he intended to rule for plaintiffs on the issue of liability.

This ruling was incorporated in the findings and conclusions filed April 4, 1978. In these findings, the court covered many of the facts discussed earlier in this statement of facts. In addition, the court made a finding as to the effect of the bypass on the river.

> The [e]ffluents discharged during the October 1975 Bypass contained, *inter alia,* human excreta, wastes, and offal, filth and decomposing matter, floating solids like fecal matter, toilet paper particles and prophylactics, etc., all of which was visible to the eye as slimy slicks, discoloration, plumes and aggregations of pollution which was offensive and repulsive to the senses of ordinary persons of normal sensitivity, and all of which produced rancid, noxious, as well as repulsive odors and stenches offensive to the sense of smell of ordinary persons of normal sensitivity, and which resulted in polluted and contaminated unhealthy waters . . .

The court also found that the injunction entered in January 1977 had been opposed by the City of Spokane because the City had intended to conduct in early 1977 a further bypass of 1.3 billion gallons of untreated sewage. When the proposed bypass was restrained, the defendants were able to find a feasible and practical alternative: construction of a shunting system into the old, existing facilities. The court found that a similar alternative could have avoided the October 1975 bypass altogether.

From these facts, the court concluded that defendants had committed numerous violations of the environmental laws of this state. The principal conclusions are as follows:

1. The bypass was a major action significantly affecting

the environment, and both defendants were required by SEPA to issue an EIS prior to conducting the bypass.

2. Both defendants are liable in money damages for the results of the bypass, which was conducted with insufficient environmental review in violation of SEPA.

The litigation now proceeded to the final two phases, both of which were concerned with the determination of the extent of defendants' liability.

Evidence before the court revealed that subsequent to the 1975 bypass there occurred algae blooms. The second phase of the litigation concerned whether these blooms were caused by the 1975 bypass. This phase involved 11 trial days during which nine experts in the field of water quality testified. After reviewing the extensive testimony, the trial court concluded that plaintiffs had not satisfied the burden of proving that the algae blooms in 1976, 1977, and 1978 were caused by the 1975 bypass. Plaintiffs do not assign error to this determination.

The hearing of the damages phase took place from September 17, 1979, through October 22, 1979. A total of 38 witnesses testified. Plaintiffs claimed compensation in six separate categories:

1. Damages for violation of their fundamental and inalienable rights under SEPA,

2. Damages for the negligent infliction of emotional distress,

3. Damages for loss of riparian rights,

4. Damages for loss of enjoyment of their waterfront properties,

5. Out–of–pocket expenses,

6. Attorney fees and costs.

Defendants contended that plaintiffs were entitled to damages only under theories of eminent domain or nuisance, which allow recovery only for diminished value of the property.

On May 23, 1980, the trial court entered its findings and conclusions in the damages phase. The findings may be summarized as follows. All of the plaintiffs purchased

property on Long Lake prior to the 1975 bypass, and all developed their properties specifically for the enjoyment of a lakefront lifestyle. The plaintiffs enjoyed use of their properties and Long Lake for fishing, hunting, boating, swimming, water–skiing, sunbathing, ice skating and picnicking. All of the plaintiffs used the lake extensively for these purposes. Many of the plaintiffs did not know prior to October 1975 of the bypassing of raw sewage into the lake during storm overflows. Plaintiffs used the lake and their properties during previous bypasses from 1958 to October 1975 without noting significant ill effects from the existing sewage treatment plant operations. Most of the plaintiffs received no notice of the October bypass itself until it was actually taking place.

After the bypass, the lake was (as described by plaintiffs) a brown or gray, gooey mess; thick and murky; and, at times, foamy. Many plaintiffs testified that the lake smelled like an outhouse or an open septic tank. The odor and visual effects remained approximately 6 to 8 weeks, with residual effects remaining until the following spring.

The impact of the October 1975 bypass denied the plaintiffs in varying degrees the use and enjoyment of Long Lake. Some plaintiffs testified that they had not used the lake since the bypass, and one plaintiff had moved from the lake after the bypass. Plaintiffs were denied use and enjoyment of their lakefront homes from October 5, 1975, through part of 1977 and to a lesser extent, 1978. Since 1978, the water quality has been restored.

All plaintiffs exhibited objective symptoms such as nausea, headaches, nervousness, or insomnia as a result of the bypass. All plaintiffs suffered psychological reactions such as fear, distress, worry, frustration, anger, and anxiety as a result of the bypass. All of the plaintiffs exhibited clinical "aversion" to the water of Long Lake as a result of the bypass.

The magnitude of the bypass created an unreasonable risk of injury, both physical and mental, to plaintiffs. The renovated Spokane sewage treatment plant, which is now

more efficient in the treatment of sewage, confers a benefit on downstream property owners, including plaintiffs.

From these findings, the court made a number of conclusions of law, the most significant of which may be summarized as follows.

In assessing the causes of action and remedies (including attorney fees), the court is required by equitable considerations to fashion a remedy to do justice to all concerned. No damages are available to any plaintiffs for violation of the fundamental and inalienable SEPA rights; the proper recourse for violation of these rights is through the available judicial or administrative process for restoration of the rights.

The October 1975 bypass proximately caused damage to all plaintiffs by denying them full use and enjoyment of their lakefront properties and lifestyle. Plaintiffs are entitled to damages for this injury.

Defendants breached their duty to plaintiffs to avoid the negligent infliction of mental distress by conducting the bypass, and plaintiffs are entitled to damages for such injury. The court, after considering all the testimony, and bearing in mind that the new treatment plant constituted a benefit to plaintiffs, and that the waters of Long Lake are improving in quality, awarded a total of $245,000 in damages to plaintiffs.

Attorney fees of $88,500 were awarded on equitable grounds in connection with the injunctive phase of the litigation because that phase performed a substantial public benefit.

Defendants are not liable for any damages arising from the algae blooms of 1976, 1977, and 1978. Increases in market value resulting from improved lake water quality are a consequence of the construction of the new sewage treatment plant, and are not a proper factor to offset or mitigate damages for loss of enjoyment of the properties.

After denial of motions for reconsideration, the parties appealed to the Court of Appeals, which certified the case to this court.

We turn now to the first issue: whether a cause of action lies against defendants for violations of various environmental laws. The trial court concluded that in conducting the October 1975 bypass, defendants violated five environmental statutes: the State Environmental Policy Act of 1971, RCW 43.21C; the water pollution control act (WPCA), RCW 90.48; the Pollution Disclosure Act of 1971 (PDA), RCW 90.52; the Water Resources Act of 1971 (WRA), RCW 90.54; and the Shoreline Management Act of 1971, RCW 90.58. Because we conclude that defendants conducted the bypass in violation of WPCA, and that this violation creates causes of action against defendants, we limit our analysis to a consideration of that statute.

The provisions of WPCA have for many years required permits for the discharge of pollutants into the waters of the state. RCW 90.48.160 provides:

> Any person who conducts a commercial or industrial operation of any type which results in the disposal of solid or liquid waste material into the waters of the state, including commercial or industrial operators discharging solid or liquid waste material into sewerage systems operated by municipalities or public entities which discharge into public waters of the state, shall procure a permit from either the department or the thermal power plant site evaluation council as provided in RCW 90.48-.262(2) before disposing of such waste material: *Provided,* That this section shall not apply to any person discharging domestic sewage only into a sewerage system.

This permit requirement is one of the measures designed to implement the policy of WPCA. This policy is declared in RCW 90.48.010:

> It is declared to be the public policy of the state of Washington to maintain the highest possible standards to insure the purity of all waters of the state consistent with public health and public enjoyment thereof, the propagation and protection of wild life, birds, game, fish and other aquatic life, and the industrial development of the state, and to that end require the use of all known available and reasonable methods by industries and others to prevent and control the pollution of the waters of

the state of Washington. Consistent with this policy, the state of Washington will exercise its powers, as fully and as effectively as possible, to retain and secure high quality for all waters of the state.

The issuance of waste disposal permits was originally delegated to the Water Pollution Control Commission (Laws of 1967, ch. 13, §§ 2, 13), but the functions of the Commission were transferred to the DOE in 1970. RCW 43.21A.060. In 1972, the permit system of RCW 90.48.160 was extended to counties and municipal or public corporations. Under RCW 90.48.162, these bodies are required to obtain a permit for the discharge of waste material from sewerage systems into the waters of the state.

The procedures established by WPCA require that applications for waste discharge permits be made at least 60 days prior to the proposed discharge. Notice of the proposed discharge is to be published, and interested parties have 30 days from the date of publication to make their interest known. RCW 90.48.170. A permit shall be issued unless the proposed discharge of waste material would pollute the waters of the state in violation of the public policy declared in RCW 90.48.010. Permits may be issued subject to conditions to avoid such pollution. RCW 90.48.180. Any person who discharges waste without a permit or in violation of the conditions of a permit is liable to pay damages and civil penalties. RCW 90.48.142, .144.

In 1972, Congress modified the federal legislation governing the discharge of pollutants into navigable waters. The new federal legislation was summarized by a federal court thus:

> In 1972 Congress passed the Federal Water Pollution Control Act Amendments [hereafter referred to as the "FWPCA" or the "Act"]. It was a dramatic response to accelerating environmental degradation of rivers, lakes and streams in this country. The Act's stated goal is to eliminate the discharge of pollutants into the Nation's waters by 1985. This goal is to be achieved through the enforcement of the strict timetables and technology-based effluent limitations established by the Act.

The FWPCA sets up a permit program, the National Pollutant Discharge Elimination System (NPDES), as the primary means of enforcing the Act's effluent limitations.

(Footnotes omitted.) *Natural Resources Defense Coun., Inc. v. Costle,* 568 F.2d 1369, 1371 (D.C. Cir. 1977).

The FWPCA (codified in 33 U.S.C. §§ 1251–1376 (1976 & Supp. 4, 1981)) is based on the proposition that "the discharge of any pollutant by any person shall be unlawful" unless specific provisions of the act are complied with. 33 U.S.C. § 1311(a).

In certain circumstances, the EPA Administrator "may . . . issue a permit for the discharge of any pollutant" notwithstanding the general proscription found in section 1311(a). The discharge of a pollutant is defined in the FWPCA as "any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft". 33 U.S.C. § 1362(12). A "point source" is defined as

any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

33 U.S.C. § 1362(14).

It has been held that the NPDES permit is the only way in which a waste discharge from a point source may avoid the total proscription of 33 U.S.C. § 1311(a).

[T]he legislative history makes clear that Congress intended the NPDES permit to be the only means by which a discharger from a point source may escape the total prohibition of § 301(a). This intention is evident in both Committee Reports. In discussing § 301 the House Report stressed:

Any discharge of a pollutant without a permit issued by the Administrator under section 318, or by the Administrator or the State under section 402 or by the Secretary of the Army under section 404 is unlawful. Any discharge of a pollutant not in compliance with

the conditions or limitations of such a permit is also unlawful.

. . .

There are innumerable references in the legislative history to the effect that the Act is founded on the "basic premise that a discharge of pollutants without a permit is unlawful and that discharges not in compliance with the limitations and conditions for a permit are unlawful."

(Footnotes omitted.) *Natural Resources Defense Coun., Inc. v. Costle,* 568 F.2d at 1374–75.

The FWPCA includes a procedure whereby each state may assume the administration of the waste permit program for pollutant discharges into navigable waters within its own jurisdiction. 33 U.S.C. § 1342(b).

This state, pursuant to section 1342(b), assumed in 1972 the administration of permits within its jurisdiction. This action resulted in the enactment in 1973 of new provisions to supplement the existing waste permit program in RCW 90.48.

Under these more recent provisions, the duty of administering the new program is imposed upon the DOE. The powers of the DOE in administering the program are enumerated in RCW 90.48.260, which provides, in part:

The department of ecology is hereby designated as the State Water Pollution Control Agency for all purposes of the Federal Water Pollution Control Act as amended and is hereby authorized to participate fully in the programs of the act as well as to take all action necessary to secure to the state the benefits and to meet the requirements of that act. The powers granted herein include, among others, and notwithstanding any other provisions of chapter 90.48 RCW or otherwise, the following:

(1) Complete authority to establish and administer a comprehensive state point source waste discharge or pollution discharge elimination permit program which will enable the department to qualify for full participation in any national waste discharge or pollution discharge elimination permit system and will allow the department to be the sole agency issuing permits required by such national system operating in the state of Washington subject to the provisions of RCW 90.48.262(2). Program

elements authorized herein may include, but are not limited to: (a) Effluent treatment and limitation requirements together with timing requirements related thereto; (b) applicable receiving water quality standards requirements . . .

The DOE is authorized to exercise the powers established under RCW 90.48.260 through the adoption of rules. RCW 90.48.262. The statute further provides that the "permit program authorized under RCW 90.48.260(1) shall constitute a continuation of the established permit program of RCW 90.48 . . ." RCW 90.48.262.

The DOE has promulgated pursuant to RCW 90.48 two sets of rules material to our analysis. The first set is WAC 173–220, the purpose of which is described in WAC 173–220–010:

> The purpose of this chapter is to establish a state permit program, applicable to the discharge of pollutants and other wastes and materials to the navigable waters of the state, operating under state law as a part of the National Pollutant Discharge Elimination System (NPDES) created by section 402 of the Federal Water Pollution Control Act (FWPCA). Permits issued under this chapter are designed to satisfy the requirements for discharge permits under both section 402(b) of the FWPCA and chapter 90.48 RCW . . .

The rules in WAC 173–220 establish an elaborate procedure governing applications for permits (WAC 173–220–040), public notice of such applications (WAC 173–220–050), public access to information (WAC 173–220–080), public hearing and notice of such hearings (WAC 173–220–090, –100). The rules also provide in detail for the terms and conditions which should be included where applicable in permits. WAC 173–220–130 through –150.

The second set of rules promulgated by the DOE pursuant to RCW 90.48 is found in WAC 173–201. The purpose of this chapter is stated to be "to establish water quality standards for surface waters of the state of Washington pursuant to the provisions of chapter 90.48 RCW and the policies and purposes thereof." WAC 173–201–010.

In addition to defining water quality criteria (WAC 173–201–020) and watercourse classifications (WAC 173–201–050 through –080), these rules include provisions directly relevant to our analysis. In particular, the rules make repeated reference to waste discharge permits as being crucial regulatory devices to achieve and maintain the water quality standards set forth in WAC 173–201. This is referred to indirectly in WAC 173–201–090, which concludes:

> [I]t shall be required that all activities which discharge wastes into waters within the state, or otherwise adversely affect the quality of said waters, be in compliance with the waste treatment and discharge provisions of state or federal law.

WAC 173–201–100(1) refers specifically to the waste disposal permit program.

> The primary means to be used for controlling municipal, commercial, and industrial waste discharges shall be through the issuance of waste disposal permits, as provided for in RCW 90.48.160 and following.

(This provision applies of course to the waste discharge in the case before us.) Waste discharges not within the ambit of WAC 173–201–100(1) are provided for in WAC 173–201–100(2) as follows:

> Miscellaneous Waste Discharge or Water Quality Effect Sources. The director shall, through the issuance of regulatory permits, directives, and orders, as are appropriate, control miscellaneous waste discharges and water quality effect sources not covered by WAC 173–201–100(1) hereof. It is noted that, from time to time, certain short–term activities which are deemed necessary to accommodate essential activities or to otherwise protect the public interest may be specially authorized by the director as indicated in WAC 173–201–035(8)(e), under such conditions as the director may prescribe, even though such activities may result in a reduction of water quality conditions below those criteria and classifications established by this regulation.

The latter part of this provision is similar to WAC 173–201–040(5), which also authorized short–term reduction in

water quality standards as follows:

(5) The criteria established in WAC 173–201–030 through 173–201–050 for any of the various classifications of this regulation may be modified by the director for limited periods when receiving waters fall below their assigned water quality criteria due to natural causes or if in the opinion of the director the protection of the overall public interest and welfare requires such modification.

Having outlined the somewhat complex legislative scheme, we turn now to the facts of this case relevant to these statutes and rules. The DOE on October 25, 1974, granted the City a waste disposal permit, WA–002447–3, authorizing effluent discharge from the City's sewerage treatment plant. The provision of this permit crucial to this appeal is General Condition G2, which provides:

Whenever a facility expansion, production increase, or process modification is anticipated which will result in a new or increased discharge, or which will cause any of the conditions of this permit to be exceeded, a new application must be submitted together with the necessary reports and engineering plans for the proposed changes. No change shall be made until plans have been approved and a new permit or permit modification has been issued.

It is undisputed that the October 1975 bypass resulted in an increased discharge and exceeded many of the conditions of the waste disposal permit. No application for a new permit, however, was made prior to the discharge. Instead, the City applied to the DOE for permission to discharge raw sewage. The DOE issued an order, pursuant to WAC 173–201, which purported to authorize the bypass. The material provision of this order is as follows:

The Director, after examination of the petition and supportive materials submitted and other material available to the department, hereby orders that the water quality criteria set forth in WAC 173–201, [are] hereby modified for a limited period which terminates at 5:00 p.m. October 10, 1975.

The thrust of defendants' argument is quite simply that this modification of the water quality standards in the Spokane River nullified General Condition G2 of the waste

disposal permit. More specifically, defendants point to two provisions in the water quality standards of 1975 which authorized short–term modifications. These provisions, WAC 173–201–040(5) and WAC 173–201–100(2), are set out above. Both authorized short–term modification of water quality standards when the director deemed such modification necessary to protect the public interest. Defendants argue that it was determined that the public interest required a short–term bypass of raw sewage to enable prompt completion of the secondary treatment plant to minimize future contamination of the Spokane River. The modification of water quality standards was therefore authorized and not wrongful.

We might well agree with this argument as far as it goes. The problem with it is that it does not go far enough. The DOE might well have validly modified water quality standards in the Spokane River, but under the complex scheme set up by the statutes and rules, that modification in no way removed the duty of defendants to comply with the terms of the waste disposal permit.

In authorizing the bypass without requiring a new waste discharge permit, the DOE ignored several of its own regulations. First, it ignored WAC 173–220–020 which places a blanket prohibition on the discharge of pollutants into navigable waters, except as authorized by a permit. Next, it ignored WAC 173–201–090, which requires that all activities which discharge wastes into the waters of the state be in compliance with waste discharge provisions of state or federal law (which, of course, include the NPDES permit scheme). It also ignored WAC 173–201–100(1) which provides that the primary means to be utilized for controlling municipal waste discharges shall be through the issuance of waste disposal permits as provided for in RCW 90.48.160.

The DOE, in authorizing the bypass without requiring a new permit, also violated the permit provisions of RCW 90.48. Nowhere in that statute is there any indication that the requirement of a waste disposal permit may be avoided by means of a modification of water quality standards.

In short, it is clear from the federal and state statutory schemes and the DOE regulations that the discharge of pollutants into state waters is prohibited unless authorized by a permit. A permit is, accordingly, required no matter what water quality standard applies to the receiving waters. Modification of the standards applicable to the receiving waters therefore can in no way remove the necessity for a permit. Moreover, if a permit has been granted, discharge of pollutants must comply with the conditions of the permit. Modification of water quality standards cannot excuse any departure from those conditions.

We conclude, therefore, that the discharge of raw sewage into the Spokane River constituted a blatant violation of Waste Discharge Permit WA–002447–3. That violation was not excused by the modification by DOE of water quality standards. The October 1975 bypass was therefore wrongful.

Defendants argue that the decision to discharge raw sewage in October 1975 was not wrongful because it was the result of a carefully reasoned choice between two alternatives. On one hand, they argue, defendants could have delayed the bypass (and consequently halted construction) until a new permit could be obtained and the river was at a higher flow. This would have avoided violation of the waste discharge permit and would have reduced the short–term effects of the bypass. This approach, however, would mean that completion of the secondary treatment plant would be delayed, and sewage would continue to be discharged after only primary treatment. On the other hand, the bypass, although requiring the short–term discharge of raw sewage, would enable the earlier completion of the secondary treatment plant. Defendants decided that the short–term effects of the discharge of raw sewage were overall preferable to the effects of continued discharge of primary treated sewage for several months.

Unfortunately, no matter how reasonable their decision might have been (and we make no determination of that matter), defendants were not authorized to make it. They

had no alternative under federal and state law but to comply with the waste discharge permit.

Moreover, it appears that the eleventh–hour makeshift authorization of the bypass by the DOE could have been avoided. The City recognized in the environmental assessment completed in 1973 that the treatment plant would have to be bypassed during construction of the headworks, and that any bypass should occur during maximum high water. The waste discharge permit issued in 1974 clearly required an additional permit for any such bypasses. The City was therefore on notice from 1974 of the need to apply for a new permit should a bypass become necessary. It failed to make provision for such a necessity until it was too late. It requested only 5 days' notice from its contractors of any need to bypass, and this, of course, was insufficient time to comply with the permit procedure. The DOE's purported authorization of the bypass pursuant to WAC 173–201 appears to be an attempt to extricate the City from the dilemma in which it found itself. The attempt is not successful.

Although the WPCA contains provisions authorizing the State to recover damages and civil penalties for violations of waste discharge permit requirements (RCW 90.48.142, .144), it does not provide for a private cause of action. Nevertheless, we conclude that the discharge of sewage in violation of the waste discharge permit constitutes a nuisance for which both defendants were responsible and entitled plaintiffs to recover damages.

Nuisance actions in this state are specifically allowed by statute. RCW 7.48. RCW 7.48.010 defines actionable nuisances for which damages and other relief are available.

> The obstruction of any highway or the closing of the channel of any stream used for boating or rafting logs, lumber or timber, or whatever is injurious to health or indecent or offensive to the senses, or an obstruction to the free use of property, so as to essentially interfere with the comfortable enjoyment of the life and property, is a nuisance and the subject of an action for damages and other and further relief.

A more specific definition of the elements of a nuisance action is provided in RCW 7.48.120:

Nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or render dangerous for passage, any lake or navigable river, bay, stream, canal or basin, or any public park, square, street or highway; or in any way renders other persons insecure in life, or in the use of property.

Nuisances are divided into public or private nuisances. "Public nuisance" is defined by RCW 7.48.130 as "one which affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal."

Every nuisance not included within the definition of public nuisance is a private nuisance. RCW 7.48.150. Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance. RCW 7.48.160.

■ The October 1975 bypass constituted a nuisance under the statutory definitions. It was a wrongful act (RCW 7.48.120) because it was conducted in violation of a waste disposal permit and RCW 90.48. The bypass therefore does not fall within the protection of RCW 7.48.160, which insulates acts performed under express statutory authority from actions for nuisance. Moreover, the trial court concluded that the bypass "denied Plaintiffs the full use and enjoyment of their lakefront properties and lifestyle." Conclusion of law 43. There is ample support for this conclusion in the record. This is equivalent to a finding that the bypass "essentially interfere[d] with the comfortable enjoyment of the life and property" of plaintiffs. RCW 7.48.010.

The bypass, therefore, constituted a nuisance for which an action in damages may be maintained under RCW 7.48. The bypass affected the rights of all members of the community living along the shores of Long Lake. It therefore comprised a public nuisance under RCW 7.48.130. *See* Comment, *Nuisance as a Land Use Control,* 46 Wash. L.

Rev. 47, 99 n.235 (1970).

The plaintiffs are entitled to bring an action for this public nuisance because they can show it is "specially injurious" to themselves. RCW 7.48.210. As residents of properties along the waterfront, plaintiffs suffered as a result of the bypass injuries considerably greater than those suffered by the general public.

■ The measure of damages recoverable by plaintiffs turns upon the nature of the nuisance—whether it is temporary or permanent.

Where the injury to land is temporary, the measure of damages is the diminished rental value if the property is to be rented, or the diminished value of its use if the property is to be used by the owner. *Papac v. Montesano,* 49 Wn.2d 484, 303 P.2d 654 (1956); *Riblet v. Spokane–Portland Cement Co.,* 45 Wn.2d 346, 274 P.2d 574 (1954); *Riblet v. Spokane–Portland Cement Co.,* 41 Wn.2d 249, 248 P.2d 380 (1952). Where injury to land caused by pollution is permanent and irreparable, the measure of damages is the difference in the market value of the property before and after creation of the nuisance. *Drake v. Smith,* [54 Wn.2d 57, 337 P.2d 1059 (1959)]; *Anderson v. Port of Seattle,* [49 Wn.2d 528, 304 P.2d 705 (1956)]; *Haveman v. Beulow,* 36 Wn.2d 185, 217 P.2d 313, 19 A.L.R.2d 763 (1950).

*Barci v. Intalco Aluminum Corp.,* 11 Wn. App. 342, 356, 522 P.2d 1159 (1974).

The effects of the bypass in the present case were temporary. The correct measure of damages is therefore the loss of use of the land caused by the nuisance. Moreover "[t]his court has recognized that recovery may be had for 'sickness, suffering, mental anguish and bodily infirmities' resulting from nuisance, in addition to property damage." *Riblet v. Spokane–Portland Cement Co.,* 45 Wn.2d 346, 353, 274 P.2d 574 (1954). The trial court therefore properly awarded damages for plaintiffs' loss of enjoyment of their property and mental anguish. The trial court's awards for these damages are supported by the record and we will not disturb them on appeal.

Plaintiffs devote a substantial portion of their briefs to an argument that the October 1975 bypass violated their "fundamental and inalienable" rights to a healthful environment, rights which are guaranteed by SEPA. Plaintiffs argue that they are entitled to damages, in addition to those awarded by the trial court, for violation of these rights. We decline plaintiffs' invitation to adopt this novel theory, particularly in a case where adequate damages are available under established theories.

We turn now to consider the defenses raised by defendants to the action.

The first defense raised against plaintiffs' recovery of damages is the argument that plaintiffs are limited to recovery allowed under rules of eminent domain. These rules, defendant City argues, limit damages to the extent to which the market value of plaintiffs' property was impaired by the acts of defendants. (This argument is advanced apparently because the record contains undisputed testimony that property values on Long Lake have been consistently increasing since 1973. Damages under a market value theory would therefore be nominal at best.)

The City cites *Brazil v. Auburn,* 93 Wn.2d 484, 496, 610 P.2d 909 (1980) for the proposition that the sole remedy available to a party from whom a governmental agency has taken property which has been put to a permanent public use is to seek compensation through an action for inverse condemnation. In such an action, the extent of recovery is limited to the decrease in the market value of the property. *Martin v. Port of Seattle,* 64 Wn.2d 309, 391 P.2d 540 (1964), *cert. denied,* 379 U.S. 989 (1965). The City argues that discharge of sewage into the Spokane River constitutes a constitutional taking amounting to inverse condemnation. It cites for this proposition *Walla Walla v. Conkey,* 6 Wn. App. 6, 11, 492 P.2d 589 (1971):

> There is no question that pollution of a stream by a municipality in carrying out its sewage disposal functions constitutes a constitutional taking, where the disposal results in pollution of the stream on such a scale as to

create a public nuisance.

This argument is without merit. While permanent or long–term pollution of a stream resulting from sewage disposal may constitute a taking, the rule is quite different where the pollution is temporary. As was pointed out in *Olson v. King Cy.,* 71 Wn.2d 279, 284, 428 P.2d 562 (1967):

> Every trespass upon, or tortious damaging of real property does not become a constitutional taking or damaging simply because the trespasser or tort–feasor is the state or one of its subdivisions, such as a county or a city.

The distinction between permanent or recurring change and temporary interference with a property right was expanded upon in *Northern Pac. Ry. v. Sunnyside Vly. Irrig. Dist.,* 85 Wn.2d 920, 924, 540 P.2d 1387 (1975):

> Plaintiff cites many cases holding that an invasion of private lands constitutes an unconstitutional taking. These cases, however, almost uniformly involve permanent or recurring damage inherent in some plan of work. The major decisions of this court considering the difficult distinction between a constitutional taking under article 1, section 16, and a mere tortious interference, are in agreement that a constitutional taking is a permanent (or recurring) invasion of private property. *Wong Kee Jun v. Seattle,* 143 Wash. 479, 255 P. 645, 52 A.L.R. 625 (1927); *Boitano v. Snohomish County,* 11 Wn.2d 664, 120 P.2d 490 (1941); *Olson v. King County,* 71 Wn.2d 279, 428 P.2d 562, 24 A.L.R.3d 950 (1967). As was pointed out by the dissenting judge below:
>
>> Temporary interference with a private property right, which is not continuous nor likely to be reoccurring, does not constitute condemnation without compensation.

(Citations omitted.)

This analysis is controlling here: the results of the bypass were temporary only, and therefore do not constitute a constitutional taking. Plaintiffs are accordingly not limited to a market value measure of damages, and are entitled to damages for the temporary nuisance.

The defendants next claim immunity from tort liability because, they contend, their conduct relative to the bypass

constituted discretionary acts.

By enactment of Laws of 1961, ch. 136, § 1, p. 1680 and Laws of 1967, ch. 164, § 1, p. 792, codified as RCW 4.92.090 and 4.96.010 respectively, the Legislature abolished sovereign immunity in Washington. These sections of the Revised Code provide:

> The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation.

RCW 4.92.090.

> All political subdivisions, municipal corporations, and quasi municipal corporations of the state, whether acting in a governmental or proprietary capacity, shall be liable for damages arising out of their tortious conduct, or the tortious conduct of their officers, agents or employees to the same extent as if they were a private person or corporation . . .

RCW 4.96.010.

■ In *Evangelical United Brethren Church v. State,* 67 Wn.2d 246, 407 P.2d 440 (1965), we created a narrow exception from these rules and recognized governmental immunity from tort liability in instances where officials engage in discretionary acts. In determining whether action is discretionary and therefore nontortious, we set forth a 4–part inquiry:

> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision? If these preliminary questions can be clearly and unequivocally answered in the affir-

mative, then the challenged act, omission, or decision can, with a reasonable degree of assurance, be classified as a discretionary governmental process and nontortious, regardless of its unwisdom.

67 Wn.2d at 255.

Subsequent to the enunciation of this 4–part test, we additionally required a demonstration that conscious balancing of risks occurred in the decisionmaking process. Specifically, we stated:

[T]o be entitled to immunity the state must make a showing that such a policy decision, consciously balancing risks and advantages, took place. The fact that an employee normally engages in "discretionary activity" is irrelevant if, in a given case, the employee did not render a considered decision.

*King v. Seattle*, 84 Wn.2d 239, 246, 525 P.2d 228 (1974). We further clarified the meaning of "discretionary activity" to include only "basic policy discretion". *Mason v. Bitton*, 85 Wn.2d 321, 534 P.2d 1360 (1975). As such, decisions made by governmental officials in "the field," though involving discretion, fall short of immunized activity. *Bender v. Seattle*, 99 Wn.2d 582, 664 P.2d 492 (1983). As we stated in *Bender* at page 588:

The purpose of our limited, court–created rule of immunity is to prevent the courts from passing judgment on basic policy decisions that have been committed to coordinate branches of government. Since the concept of discretionary governmental immunity is a court–created exception to the general rule of governmental tort liability, its applicability is necessarily limited only to those high level discretionary acts exercised at a truly executive level.

Applying these principles and the *Evangelical* test to this case, we find no immunity. The decision of the defendants in this case did meet the first element of the test. That decision involved a basic governmental objective, completion of the treatment facility. The defendants have similarly shown that the decision met the second element of realization of the governmental objective. We find, however,

that although the decision to conduct the bypass involved the exercise of expert judgment, that decision was an exercise of technical engineering and scientific judgment. It was not the "truly discretionary governmental acts on an executive level" as found in the Governor's action in *Cougar Business Owners Ass'n v. State,* 97 Wn.2d 466, 471, 647 P.2d 481 (1982). Furthermore, as is discussed elsewhere in this opinion, the bypass violated the waste discharge permit; the decision therefore falls short of the fourth *Evangelical* criterion of lawfully authorized activity. The bypass was therefore not an immunized act.

Defendants next argue that plaintiffs' action against the State is barred by plaintiffs' failure to file a claim for damages as required by RCW 4.92.110. Plaintiffs do not dispute that they failed to file a claim. Rather, they argue that the State waived its right to object to their failure to file.

RCW 4.92.110 provides:

No action shall be commenced against the state for damages arising out of tortious conduct until a claim has first been presented to and filed with the director of financial management. The requirements of this section shall not affect the applicable period of limitations within which an action must be commenced, but such period shall begin and shall continue to run as if no claim were required.

In the case before us, this statute was not raised as a defense by the State until February 15, 1979, 3 years after the litigation began. At that time, the first phase of litigation had been completed. Several days of hearings had been conducted, and the trial court had entered its first set of findings and conclusions. In view of the substantial litigation which had occurred before the defense was raised, we agree with the trial court that defendants had waived any objections to plaintiffs' failure to file under RCW 4.92.110.

The final issue meriting our consideration is whether the trial court properly awarded plaintiffs attorney fees of $88,500. The award was explained in conclusion of law 54.

An equitable award of attorneys' fees and costs of suit

to Plaintiffs is merited in connection with the first or injunctive, etc. phase of this litigation, which performed a substantial public benefit . . .

Plaintiffs concede that a court may award attorney fees as part of the costs of litigation only when there is a contractual, statutory, or recognized equitable basis. *Crane Towing, Inc. v. Gorton,* 89 Wn.2d 161, 176, 570 P.2d 428, 97 A.L.R.3d 482 (1977). They concede also that here there are no contractual or statutory bases for fees; the award must be sustained on some recognized ground of equity.

The equitable grounds upon which an award of fees may be made are cataloged in the opinion of this court in *PUD 1 v. Kottsick,* 86 Wn.2d 388, 545 P.2d 1 (1976). There are four such grounds: bad faith conduct of the losing party, preservation of a common fund, protection of constitutional principles, and private attorney general actions. These will be discussed in turn.

## A
### BAD FAITH

"A court may grant attorney fees to the prevailing party if the losing party's conduct constitutes bad faith or wantonness." 86 Wn.2d at 390. Plaintiffs argue that defendants acted in bad faith in the present case by conducting the bypass at low river flow, after giving their word that any bypass would be conducted only at high river flow.

Bad faith conduct, although occasionally mentioned as a basis for a fee award (*e.g., Hsu Ying Li v. Tang,* 87 Wn.2d 796, 798, 557 P.2d 342 (1976)), does not appear to have been the basis of any award approved by this court. Only one case from this jurisdiction cited by plaintiffs affirms a fee award on this ground, and it does so without discussion. *Seals v. Seals,* 22 Wn. App. 652, 658, 590 P.2d 1301 (1979).

We hold that the conduct of defendants in this case, although possibly exhibiting a lack of concern for the sensibilities of plaintiffs, does not rise to a level of bad faith which would distinguish it from other cases where plaintiffs' rights are infringed. There is no bad faith sufficient to justify an award of fees.

## B
### COMMON FUND

In *PUD 1 v. Kottsick,* we explained the common fund exception thus:

We first applied this exception to cases where the litigant preserved or created a specific monetary fund for the benefit of others as well as himself. *Peoples Nat'l Bank v. Jarvis,* 58 Wn.2d 627, 364 P.2d 436 (1961). This court broadened the exception in that it is no longer limited to situations where the litigant preserved or created a specific monetary fund. The exception now extends to situations where the litigant confers a substantial benefit on an ascertainable class. *Baker v. Seattle–Tacoma Power Co.,* 61 Wash. 578, 112 P. 647 (1911); *Grein v. Cavano,* 61 Wn.2d 498, 379 P.2d 209 (1963).

86 Wn.2d at 390–91.

At first blush, this passage appears to create a broad "substantial benefit" exception to the no–attorney–fees rule. The passage might be read as extending the exception beyond those cases where the litigant preserved or created a fund from which the fees could be claimed. Such an interpretation was squarely rejected, however, in *Seattle Sch. Dist. 1 v. State,* 90 Wn.2d 476, 543–44, 585 P.2d 71 (1978).

By eliminating the need for a specific *monetary* fund, we did not eliminate the need for accumulating, preserving, or creating a *common* fund. *Kottsick,* and the cases upon which it relies, merely eliminate the need to create a *monetary* common fund. *Kottsick* does not eliminate the need to create a *common fund* from which attorneys' fees may be drawn to justify an award of such fees. The common fund may be monetary; it may be the enrichment of a corporation by securing the return of the value of stocks and bonds as in *Baker v. Seattle–Tacoma Power Co.,* 61 Wash. 578, 112 P. 647 (1911); the common fund also may be preservation of funds by forcing proper accounting and bookkeeping procedures as in *Grein v. Cavano,* 61 Wn.2d 498, 379 P.2d 209 (1963); but there must be an immediate *common fund* from which attorneys' fees may be drawn. *See generally Crane Towing, Inc. v. Gorton,* [89 Wn.2d 161, 570 P.2d 428, 97 A.L.R.3d

482 (1977)]; *Swift v. Island County,* [87 Wn.2d 348, 552 P.2d 175 (1976)].

No such "immediate *common fund"* was created or preserved in the present case; the exception is therefore inapplicable.

## C
### PROTECTION OF CONSTITUTIONAL PRINCIPLES

This exception was recognized in *Weiss v. Bruno,* 83 Wn.2d 911, 914, 523 P.2d 915 (1974). It allows attorney fees where four narrowly drawn requirements are met:

1. A successful suit brought by petitioner,

2. Challenging the expenditure of public funds,

3. Made pursuant to patently unconstitutional legislative and administrative actions,

4. Following a refusal by the appropriate official and agency to maintain such a challenge.

This exception has been narrowly construed (*see Seattle Sch. Dist. 1 v. State,* 90 Wn.2d at 545) and clearly does not apply here. No "patently unconstitutional . . . administrative actions" were challenged in this litigation.

## D
### PRIVATE ATTORNEY GENERAL

This court recognized in *PUD 1 v. Kottsick,* 86 Wn.2d at 392, a potential fourth exception to the no–attorney–fee rule: the doctrine of "private attorney general".

Simply stated, this doctrine provides that a private attorney general may be awarded attorney fees whenever the successful litigant (1) incurs considerable economic expense, (2) to effectuate an important legislative policy, (3) which benefits a large class of people. This court has yet to adopt this exception to the no–attorney–fees rule.

This theory was urged on the court in *Swift v. Island Cy.,* 87 Wn.2d 348, 362–63, 552 P.2d 175 (1976). In that case, we declined to adopt the theory.

In the present case, however, we are persuaded that the private attorney general theory should be applied to allow plaintiffs to recover attorney fees incurred in the injunctive

phase of the litigation. Plaintiffs clearly satisfy all three criteria identified in *PUD 1 v. Kottsick:* they incurred considerable expense in seeking the injunction; by obtaining the injunction, plaintiffs effectuated the important legislative policy of SEPA and other environmental legislation of this state; and the prevention of the discharge of 1.3 billion gallons of raw sewage into the Spokane River benefited not only plaintiffs, but all those who live, work, or play on or near the river. Indeed, it is difficult to conceive of a case in which adoption of the private attorney general theory would be more appropriate.[1]

Accordingly, we affirm the trial court's award of attorney fees in the injunctive phase of the proceedings.

The other issues raised by the parties have been considered and found to be without merit or unnecessary to discuss in light of our disposition of this case.

The trial court is affirmed.

WILLIAMS, C.J., and STAFFORD, J., concur.

DOLLIVER, J. (concurring in part, dissenting in part)—I concur with the majority except for the question of attorney fees. On this issue I dissent. As the majority recognizes, this court has repeatedly expressed its reluctance to award attorney fees as costs of litigation unless there is a contractual, statutory, or recognized equitable basis for the award. *See, e.g., Asarco Inc. v. Air Quality Coalition,* 92 Wn.2d 685, 715, 601 P.2d 501 (1979); *Crane Towing, Inc. v. Gorton,* 89 Wn.2d 161, 176, 570 P.2d 428, 97 A.L.R.3d 482 (1977); *Swift v. Island Cy.,* 87 Wn.2d 348, 362, 552 P.2d 175 (1976). In *PUD 1 v. Kottsick,* 86 Wn.2d 388, 545 P.2d 1 (1976), we suggested in dicta that attorney fees might be recoverable under the doctrine of "private attorney general" when the litigant (1) incurs considerable economic expense, (2) to effectuate an important legislative policy,

---

[1] We note the Legislature is considering proposed legislation to allow attorney fees to an attorney who acts as a private attorney general. Laws of 1983, ch. 127, § 2.

(3) which benefits a large class of people. *Kottsick,* 86 Wn.2d at 392. In *Swift v. Island Cy., supra,* however, we rejected the private attorney general doctrine as a basis for recovery. *See Swift,* 87 Wn.2d at 362–63. I see no reason to depart from our holding in *Swift. See* Talmadge, *The Award of Attorneys' Fees in Civil Litigation in Washington,* 16 Gonz. L. Rev. 57, 65–67 (1980). *See generally* 51 Wash. L. Rev. 1047 (1976).

The present case is a tort action for nuisance. As the majority evidently concedes, plaintiffs fail to demonstrate that a private cause of action, either express or implied, exists under the Federal Water Pollution Control Act Amendments of 1972 (Pub. L. No. 92–500, § 2, 86 Stat. 880 (1972), 33 U.S.C. § 1342 (1976 & Supp. 4, 1981)) or the environmental legislation of this state, including RCW 43.21C, the State Environmental Policy Act of 1971 (SEPA), and RCW 90.48, the Coastal Waters Protection Act of 1971. *See* RCW 90.48.037; RCW 43.21C.080–.085; RCW 43.21B.250. *See generally California v. Sierra Club,* 451 U.S. 287, 292–98, 68 L. Ed. 2d 101, 101 S. Ct. 1775 (1981); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15–19, 62 L. Ed. 2d 146, 100 S. Ct. 242 (1979). *See also Baerlein v. State,* 92 Wn.2d 229, 231, 595 P.2d 930 (1979). In fact, federal courts considering the question have found that no private cause of action exists under the Water Pollution Control Act Amendments. *E.g., District of Columbia v. Schramm,* 631 F.2d 854, 863 (D.C. Cir. 1980); *Chesapeake Bay Found., Inc. v. Virginia State Water Control Bd.,* 495 F. Supp. 1229, 1236–37 (E.D. Va. 1980). *See also California v. Sierra Club, supra* at 298. Furthermore, there is nothing in the language of the state or federal statutes, in direct language or by implication, to indicate that they were intended to create state or federal rights for a special "large class of people". *PUD 1 v. Kottsick, supra* at 392. Rather, in the language of the Supreme Court in *California v. Sierra Club, supra* at 298, the statutes were "intended to benefit the public at large through a general regulatory scheme".

I cannot see how an "important legislative policy" is served by this litigation since both Congress and the Legislature failed even to provide for the litigation in the legislation it purportedly serves. It may be the majority believes all legislative enactments are "important legislative policy" and any private litigation which involves the implementation or enforcement of legislation qualifies under the test. This, of course, would make the test meaningless. At the very least I believe there should be some guidelines and the authorization of some private cause of action would be a useful guideline in determining whether important legislative policy is being implemented. *See, e.g.,* the Consumer Protection Act, RCW 19.86. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 264, 44 L. Ed. 2d 141, 95 S. Ct. 1612 (1975).

Finally, I am not certain whether there has been "a considerable economic expense". The attorney fees are $88,500. There are nine families who are plaintiffs. Dividing 9 into $88,500 results in attorney fees for each family of $9,833. If plaintiff Lake Spokane Environmental Association is added, the total fees for each plaintiff equal $8,850. This may or may not be "a considerable economic expense". Nothing in the record indicates the ability of plaintiffs to pay, nor are any criteria for defining the term suggested by the majority. Plaintiffs have been awarded $245,000 in damages which, of course, will more than cover any attorney fees.

While I do not believe we should adopt the private attorney general theory under any circumstances, it is apparent that in this case none of the tests suggested in *PUD 1 v. Kottsick, supra,* for such an award have been met. Therefore, I would deny payment of attorney fees by defendants to plaintiffs.

UTTER, BRACHTENBACH, and DIMMICK, JJ., concur with DOLLIVER, J.

DORE, J. (concurring in part, dissenting in part)—I con-

cur in the result reached by the majority but would modify the attorney fees award. However, I would affirm judgment for damages under eminent domain as I find the majority's application of nuisance theory inappropriate. I dissent from award of attorney fees for services limited to the injunctive phase of the trial. In upholding the main action on eminent domain, plaintiffs are entitled to reasonable attorney fees for all legal services rendered during the trial.

## I

The recovery under eminent domain is justified as a result of the governmental entities taking or damaging the plaintiffs' property without just compensation.

Const. art. 1, § 16 (amend. 9) provides:

No private property shall be taken or damaged for public . . . use without just compensation having been first made . . .

It is a long–established principle that the discharge of sewage or the pollution of water to the injury of an individual is compensable under eminent domain provisions. *Walla Walla v. Conkey,* 6 Wn. App. 6, 492 P.2d 589 (1971), *review denied,* 80 Wn.2d 1007 (1972); *Snavely v. Goldendale,* 10 Wn.2d 453, 117 P.2d 221 (1941); *Crane v. Brintnall,* 29 Ohio Misc. 75, 278 N.E.2d 703 (1972); *Krambeck v. Gretna,* 198 Neb. 608, 254 N.W.2d 691 (1977); *Game & Fish Comm'n v. Farmers Irrig. Co.,* 162 Colo. 301, 426 P.2d 562 (1967); *Amador Vly. Investors v. Livermore,* 43 Cal. App. 3d 483, 117 Cal. Rptr. 749 (1974); *see also* W. Stoebuck, *Nontrespassory Takings in Washington* (1980).

The fact that the governmental body may also be subject to a tort action for nuisance does not preclude it from liability for a taking under eminent domain theory. In *Snavely v. Goldendale, supra,* this court indicated that while polluting a stream is generally held to be tortious, it may assume the character of a taking or damaging of property in contemplation of the constitutional guaranty when a municipal corporation does it on such a scale as to create a public nuisance. *Snavely,* at 455–56; *accord, Walla Walla v.*

*Conkey, supra* at 11. The *Snavely* court held that the plaintiff's action lay in eminent domain, for the action could not have been supported on nuisance theory for failure to comply with the nonclaims statute.

In a decision quite similar to the instant action, the Supreme Court of New Hampshire held in *Sundell v. New London,* 119 N.H. 839, 409 A.2d 1315 (1979) that the landowners could recover damages in either nuisance or inverse condemnation. The court held that where, as littoral owners, plaintiffs who brought action against a town which operated a sewage treatment plant which discharged nutrient–laden effluent into a brook, a tributary of a lake, had rights below the highwater line in front of their property to use waters for "a panoply of recreational activities," and a town's effluent–spawned algae invaded these water spaces causing substantial interference with plaintiffs' use of this space for bathing, swimming, boating and other recreational purposes, there had been sufficient physical invasion of plaintiffs' property to constitute inverse condemnation. The court indicated that the facts necessary to entitle the plaintiffs to a judgment on the nuisance count would also support a judgment on the inverse condemnation count. *Accord, Duffield v. DeKalb Cy.,* 242 Ga. 432, 249 S.E.2d 235 (1978); *Omaha v. Matthews,* 197 Neb. 323, 248 N.W.2d 761 (1977).

As the *Snavely* case indicates, in many instances an owner who has suffered a "taking" or "damaging" by reason of water pollution may also claim damages on a tort–nuisance theory. However, RCW 7.48.160 provides that nothing which is done or maintained under the express authority of a statute can be deemed a nuisance. *See Deaconess Hosp. v. State Hwy. Comm'n,* 66 Wn.2d 378, 403 P.2d 54 (1965). Yet, if a taking theory is available, it is not susceptible to this defense. *See Steele v. Queen City Broadcasting Co.,* 54 Wn.2d 402, 341 P.2d 499 (1959).

Though our previous decisions indicate that a nuisance can assume the character of a taking, this language equates nuisance with takings only on the factual level. A court

applying eminent domain theory simply determines if the riparian owner's use of his property is unreasonably impaired and if the impairment was caused by activity of a governmental entity. If so, a taking has occurred. The plaintiffs, in order to succeed on their eminent domain theory, need not establish that the sewage discharge was tortious.

The majority opinion goes to great lengths to establish that the sewage discharge was tortious or, in other words, done without authority of statute. The majority finds that although the discharge was in compliance with the applicable water quality criteria, it was wrongful because the discharge violated the terms of the waste disposal permit.

Although the majority concedes that the water pollution control act, RCW 90.48, does not provide for a private cause of action for violations of waste discharge permit requirements, the majority nevertheless concludes that the discharge of sewage in violation of the discharge permit constitutes a nuisance. However, it is not the violation of the permit requirements that is the proximate cause of plaintiffs' injuries, but the actual discharge of the sewage that proximately caused the damage to plaintiffs' property. The Department of Ecology, and the City of Spokane acting upon its directives, was of the opinion that their actions were in compliance with the applicable environmental laws. The majority finds that this was not the case because the procedures of the water pollution control act not only require a lowering of the water quality criteria, but issuance of a new or amended discharge permit in order that the City could legally discharge the sewage into the river.

The majority's holding is based upon the mere fortuitous circumstance that a new discharge permit was not issued in conjunction with the temporary lowering of the water quality criteria. The clear implication of the majority opinion is that the property owners would be without a cause of action if the City had obtained a new discharge permit even though the end result would have been the same. There is no evidence in the record that procedural compliance would

have averted the damages to the property owners. At most, the property owners would have had advance notice of the pending discharge and an opportunity to express their concerns. We cannot say, either legally or factually, that plaintiffs' injuries would have been avoided if the City had applied for a new discharge permit and/or whether the decision to proceed would have been different. It is pure speculation, and contrary to the substantial body of evidence in the record, that the damages to plaintiffs would have been avoided had the City and Department of Ecology complied with the procedural mandate of the statute. The law is well settled that if an event would have happened regardless of defendant's wrongful conduct, the wrongful conduct is not the proximate cause of the event. *Ross v. Altvater*, 72 Wn.2d 63, 431 P.2d 701 (1967); *Litts v. Pierce Cy.*, 9 Wn. App. 843, 515 P.2d 526 (1973). The nuisance action against the governmental entities lacks a proximate cause to show that the wrongful conduct was the legal cause of plaintiffs' injuries.

The majority opinion rejects the taking issue because the results of the discharge were temporary only. I disagree.

The constitution contains no requirement that the damage be permanent. The plain meaning of the words used in the constitution is that, if a person's property is damaged for public use, he shall be compensated, whether the damage is permanent or is temporary in nature.

Although there are some judicial pronouncements to the contrary, this court has generally held compensable damages for a temporary taking under the constitutional provision. *See Northern Pac. Ry. v. Sunnyside Vly. Irrig. Dist.*, 85 Wn.2d 920, 925, 540 P.2d 1387 (1975) (Rosellini, J., dissenting).

The damaging of property by a body having the power of eminent domain may be either permanent or temporary. When the injury is not permanent, the nature of damages is the costs of restoration and loss of use pending restoration. *Brazil v. Auburn*, 93 Wn.2d 484, 493, 610 P.2d 909 (1980); *Colella v. King Cy.*, 72 Wn.2d 386, 433 P.2d 154 (1967).

The record in the instant action establishes that the Department of Ecology and City of Spokane substantially interfered and deprived the plaintiffs of the use of their property through the discharge of raw sewage into the Spokane River. The damages for this temporary taking and consequential damages caused by such taking are supportable by the record.

## II

RCW 8.25.075 provides that a superior court rendering a judgment for the plaintiff awarding compensation for the taking of real property for public use without just compensation having been first made to the owner shall award or allow to such plaintiff costs including reasonable attorney fees. The statute is mandatory in its terms, and entitles the plaintiffs to their attorney fees in the superior court proceeding. *Brazil v. Auburn, supra* at 497.

The plaintiffs are additionally entitled attorney fees accrued in this appeal. *B & W Constr., Inc. v. Lacey,* 19 Wn. App. 220, 227–30, 577 P.2d 583 (1978); *Snohomish v. Joslin,* 9 Wn. App. 495, 498–500, 513 P.2d 293 (1973).

### CONCLUSION

1. I would affirm plaintiffs' judgment for damages based on inverse condemnation (eminent domain).

2. I would set aside the attorney fees awarded which were limited to services for injunctive relief, and remand to the trial court for the setting of reasonable attorney fees for all legal services rendered during the trial, pursuant to RCW 8.25.075.

ROSELLINI, J., concurs with DORE, J.

Reconsideration denied May 11, 1984.